## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSHUA URIOSTE,

      Plaintiff,

      vs.                        No. 1:16-CV-00755-JCH-KRS

CORIZON AND CENTURION
HEALTH CARE PROVIDERS, et al.,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Joshua Urioste, a prisoner incarcerated at the Penitentiary of New Mexico ("PNM") in Santa Fe County, New Mexico, has filed a complaint against several correctional officers and medical providers pursuant to 42 U.S.C. § 1983. (Doc. 1); (*see also* Doc. 24); (Doc. 62). Among other claims, Urioste asserts violations of his First and Eighth Amendment rights stemming from delays in the provision of medical care and related retaliation by various Defendants. On May 11, 2017, the Court referred this case to United States Magistrate Judge Kevin R. Sweazea to conduct any necessary hearings and to recommend an ultimate disposition. (*See* Doc. 19).

This matter is before the undersigned on the *Martinez* report filed by Defendants German Franco, Clarence Olivas, Michelle Boyer, Roger Trujillo, Kyle Perez, Augustine Palomino, and Oscar Trevizo (collectively the "NMCD Defendants"), filed on May 5, 2020.[1] (Doc. 44). Urioste timely filed a response brief on June 16, 2020. (Doc. 55). With the Court's permission (*see* Doc. 60), the NMCD Defendants filed a reply brief on July 21, 2020. (Doc. 61). Urioste filed a

---

[1] Another corrections officer Defendant, "Officer Cordova," has not been served in this action. (*See, e.g.*, Doc. 31). Additionally, the Court has only recently ordered service on another corrections official, Gary Maciel, who was added to this action by operation of Urioste's most recent amended pleading (Doc. 62). Both matters are addressed in separate orders (*see* Doc. 66); (Doc. 69), and the undersigned does not address allegations or claims against those Defendants except as necessary to resolve the instant *Martinez* report.

surreply on August 7, 2020. (Doc. 63). With the Court's permission (Doc. 60), Urioste also filed his Second Amended Complaint on July 31, 2020. (Doc. 62).

Having considered the parties' submissions to date along with the available record, the undersigned RECOMMENDS, as described further herein, that the Court: (1) STRIKE certain allegations in Urioste's Second Amended Complaint; (2) GRANT Urioste permission to file his surreply *nunc pro tunc* to August 7, 2020; (3) GRANT summary judgment to the NMCD Defendants as to Urioste's Eighth Amendment deliberate indifference claims; (4) DENY summary judgment to Defendant Palomino as to certain retaliation claims against him; and (5) GRANT summary judgment to the NMCD Defendants as to Urioste's remaining retaliation claims.

## I.  FACTUAL BACKGROUND

Unless otherwise noted, the facts described herein are not in genuine dispute for present purposes. Because Urioste's pleading allegations are limited to activity in 2016, all dates cited herein are in 2016 unless otherwise stated.

During all relevant periods, Urioste was in the custody of the New Mexico Corrections Department ("NMCD") and was housed at PNM's North Facility. (*See, e.g.*, Doc. 44-2 at 113-20); (*see also* Doc. 44-1 at 2).[2] At all relevant times, Franco served as the warden at PNM, Olivas was the deputy warden responsible for operations at the North Facility, Boyer served as the facility's grievance officer, and Trujillo, Perez, and Palomino were correctional officers assigned to PNM. (*See* Doc. 62 at 2-3). Trevizo, though employed by NMCD at the time, did not work at PNM. (*See* Doc. 44-5).

---

[2] Because the parties use different page-numbering schemes and sometimes incorrectly paginate filings, all citations to the parties' filings and exhibits are to the corresponding ECF page numbers unless otherwise specified.

## A. MEDICAL ALLEGATIONS

On February 14, Urioste began coughing up blood, fainting, and injuring himself. (Doc. 62 at 4). Although Urioste states that he "began seeking medical attention" on this date, he does not elaborate as to how he did so (*see id.*), and nothing in the record shows that he notified any of the NMCD Defendants of his issues at that time.

On the morning of February 17, after experiencing cramping and coughing up blood, Urioste was seen at the PNM medical clinic. (*Id.*). Progress notes state that Urioste complained of diarrhea and other problems but "ha[d] not told anyone [of his symptoms] until now." (Doc. 44-3 at 5) (interdisciplinary progress notes). Urioste was given medication and placed on medical observation for a brief period. (*See id.*); (Doc. 62 at 5).

On February 18, Urioste experienced more cramping and vomiting, and he "began to feel extreme nausea and fatigue" while outside in recreational cages. (Doc. 62 at 5). He notified Trujillo of his condition, and unnamed correctional officers carried him to his unit at the end of his "rec" period, at which time he was seen by PNM medical providers. (*See id.* at 5-6). Urioste remained on medical observation until February 20, when he was returned to his unit after stating that he felt better. (Doc. 44-3 at 5-7); (*see also* Doc. 62 at 10).

Urioste experienced more pain and nausea on February 21, and he informed unidentified "security" officials that he needed medical attention. (Doc. 62 at 10). On February 22, PNM medical staff examined Urioste and sent him to the emergency department at St. Vincent's Hospital in Santa Fe. (*See* Doc. 44-3 at 8); (Doc. 62 at 10-11). Urioste was ultimately diagnosed with cholelithiasis (gallstones) and gastritis, and he was told that he would "eventually" need surgery to remove his gallbladder. (Doc. 44-3 at 8-9); (Doc. 62 at 11). Urioste was prescribed various medications and a bland low-fat diet, and he was discharged and returned to a medical

cell at PNM on the evening of February 23 before being sent back to his unit the next afternoon. (*See* Doc. 44-3 at 8-9); (Doc. 62 at 12).

Urioste continued to seek additional treatment that he states was not properly afforded to him by prison medical staff. (*See, e.g.*, Doc. 62 at 13-14). Urioste's earliest complaints center on his repeated submission of sick-call slips and requests for nausea medication over the next month, which he states that medical personnel ignored or denied. (*See, e.g.*, *id.* at 14-15). However, Urioste also alleges a variety of other purportedly wrongful acts concerning his medical treatment by persons other than the NMCD Defendants over the period of March through early July 2016. (*See generally* Doc. 62 at 15-25). On July 12, 2016, about two weeks after this lawsuit was initiated (see Doc. 1), a nurse told Urioste that he was scheduled for surgery (Doc. 62 at 25). Urioste's gallbladder was surgically removed on July 14 (*id.* at 26), and the Second Amended Complaint asserts no additional claims concerning improper medical treatment (or lack thereof) after July 2016.

## B.   GRIEVANCES AND OTHER COMMUNICATIONS

Urioste alleges that he submitted an informal grievance "directly" to Unit Manager Gary Maciel on February 22, apparently prior to his medical visit later that day, concerning his treatment by prison medical staff on February 17-18. (*See* Doc. 44-2 at 18-19); (Doc. 62 at 43).[3] Urioste filled out and submitted to Maciel a second informal grievance against "Medical" on February 29, alleging that the doctor at PNM had denied him medication and stating that he

---

[3] Although the grievance itself is also signed by Urioste on February 22, the "date received" field on that form, which was filled out by Maciel, indicates that Urioste actually submitted the grievance to him on March 2. (*See* Doc. 44-2 at 18). For present purposes, the undersigned resolves this inconsistency in Urioste's favor and assumes that the grievance was submitted as of the date Urioste signed it. However, the Court disregards Urioste's allegations concerning the contents of that grievance (*see* Doc. 62 at 43) to the extent that the allegations are inconsistent with his own narrative in that document and inconsistent with the time frame of his hospitalization. *See, e.g.*, *Vette v. Sanders*, 989 F.3d 1154, 1164-65 (10th Cir. 2021) (citing, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (resolving inconsistencies at summary judgment in favor of "objective documentary evidence" provided by plaintiff where such evidence "blatantly contradict[s]" her own account).

needed to have his gallbladder removed. (*See* Doc. 44-2 at 20). Maciel requested more information from PNM medical staff as to these two grievances on March 2, and again on April 13, but he received no response. (*See id.* at 18, 20); (*see also* Doc. 44-1 at 2).

On May 3, Maciel noted that he had not yet received any response from PNM medical staff concerning Urioste's February 22 and February 29 informal grievances, and he recommended that Urioste pursue a formal grievance. (Doc. 44-2 at 18, 20). Urioste received Maciel's responses that day (*see id.*) and immediately submitted a formal grievance to Boyer, requesting "proper medical treatment" and "proper administrative action . . . for lack of medical treatment." (*See id.* at 17). Boyer accepted this formal grievance for consideration on May 9 and sent an email to PNM medical staff asking that the matter be looked into. (*See id.* at 16-17). She received a response from PNM medical staff on June 6 stating that Urioste had been treated by medical personnel twice in April, that orders for pain medications had been entered, and that he was scheduled for another examination that day. (*Id.* at 15). Boyer recommended that the grievance be marked as resolved, and Franco marked it as such on June 22. (*Id.* at 14).

Urioste appealed Franco's response to his grievance to the Director of Adult Prisons (the "Director") on July 5, 2016. (*See, e.g.*, Doc. 55 at 61). It is not clear when the Director resolved the appeal; on January 17, 2017, following a request for follow-up by Urioste, NMCD's Grievance Appeals Coordinator forwarded an unsigned and undated copy of the Director's decision affirming the resolution of the grievance. (*See id.* at 61-63).

In late March through July 2016, Urioste allegedly wrote multiple letters and complaints (including his appeal of the February grievances) to Franco and Olivas concerning his medical condition and other matters. (*See, e.g.*, Doc. 62 at 30-32). Urioste received no response to these communications from either individual. (*See id.*).

### C.   OTHER ALLEGATIONS

Urioste alleges multiple purportedly wrongful acts by Perez, Trujillo, Palomino, and others from late February through June 2016, many of which concerned discipline that he received, and only some of which were related to his claims concerning his medical conditions and treatment. On March 15, two officers who are not Defendants to this lawsuit conducted a shakedown of Urioste's cell and found an "altered razor" and a length of wire, which were deemed to be contraband. (*See* Doc. 44-2 at 106); (*see also* Doc. 62 at 36) (describing cell shakedown). A hearing was conducted on March 24, and Franco approved the hearing officer's recommendation that Urioste's phone and rec privileges be revoked for thirty days. (*See* Doc. 44-2 at 103). As a further result, on April 14, Maciel approved an order regressing Urioste to "Step 2" under the NMCD Predatory Behavior Management Program ("PBMP") Conditions of Confinement policy. (*See* Doc. 55-1 at 17); (*see also* Doc. 62 at 37-38) (describing Maciel involvement); (Doc. 44-4 at 198) (discussing step regression).

Around the same time, Urioste was repeatedly brought before PNM's Unit Management Team disciplinary committee ("UMT") for multiple infractions. After Perez allegedly caught Urioste "fishing" with another prisoner on March 22, and after Perez and Trujillo allegedly caught him fishing again on March 24, Urioste was brought before the UMT for hearings, after which time Maciel revoked two days of rec time for each infraction. (See Doc. 55-1 at 19, 21) (describing incidents); (see also Doc. 62 at 36-37) (alleging Perez and Trujillo involvement and medical demands). On April 1, NMCD revoked thirty days of Urioste's good-time credit in light of these fishing offenses and the earlier contraband infraction. (*See* Doc. 55-1 at 18). After Urioste was caught fishing yet again on April 16, he was again brought before the UMT, and Maciel caused him to be regressed to "Step 1" in the PBMP. (See *id.* at 19); (see also Doc. 62 at

38-39). On June 17, following a fishing report lodged by Palomino three days earlier, Urioste was again regressed to "Step 1" by Maciel following a UMT proceeding. (*See* Doc. 62 at 40-41).

Urioste's remaining potpourri of allegations is more varied. On February 28, Palomino "refused to call medical" on his behalf; the surrounding circumstances of this incident are not addressed. (*Id.* at 36). Also on February 28, Perez and Trujillo denied him a scheduled legal call. (*Id.*). On April 7, Palomino denied Urioste another legal call. (*Id.* at 37). On April 9, Trujillo and Perez sprayed Urioste with mace; Urioste does not allege the circumstances behind that spraying except to state that he had been "requesting medical all day." (*Id.*). On April 11, Maciel and Palomino cancelled another of Urioste's attorney phone calls. (*See id.*). After Urioste again requested medical help on April 20, Palomino sprayed him with mace, then laughed and observed that Urioste "[could]n't call for medical now." (Doc. 62 at 38). The following day, after again "requesting medical," Urioste was sprayed with mace by Perez. (*Id.*). On April 22, Trujillo and Perez purportedly "sprayed an unknown substance" on Urioste's food. (*Id.* at 39). Urioste claims that he tasted bleach in his food on April 28 after Trujillo and Perez "put the chow cart where the plaintiff could not see it," and he saw the same officers "tampering with the food" in an unspecified fashion at a later meal. (*Id.*). Urioste was sprayed with mace by the same officers "after requesting medical" on April 29. (*Id.* at 39-40). Trujillo sprayed Urioste with mace again on May 11 "for no reason" and served rotten milk to him on May 26. (*Id.* at 40). On June 14, Palomino "put[] the plaintiff's life in danger" by calling him a "rat" for filing complaints concerning rec time and medical treatment, and he allegedly reported Urioste for fishing on the same date. (*See id.* at 40-41).

## II.  RELEVANT PROCEDURAL BACKGROUND

Urioste initiated this lawsuit through the filing of a complaint focused primarily on alleged Eighth Amendment violations on June 29, 2016. (Doc. 1). The Court subsequently dismissed Urioste's complaint but provided leave to amend to cure pleading defects. (Doc. 22). On January 18, 2019, Urioste filed an amended pleading (hereinafter the "First Amended Complaint") adding various claims and Defendants. (Doc. 24).[4] On review pursuant to 28 U.S.C. § 1915A, the Court dismissed certain claims and parties but ordered issuance of notice and waiver of service forms to the remaining Defendants, including the NMCD Defendants. (Doc. 26). Although service of process on some Defendants remained pending, the undersigned directed Defendants to submit a *Martinez* report addressing Urioste's claims. (Doc. 30).

On April 10, 2020, Urioste filed a motion to amend his complaint a second time in order to substitute Maciel as a Defendant in place of Trevizo. (Doc. 38). Before this motion could be resolved, the NMCD Defendants timely filed their *Martinez* report and supporting documentation on May 5, 2020.[5] (Doc. 44). On June 3, 2020, Urioste again moved for permission to amend his complaint so as to substitute Maciel in place of Trevizo (Doc. 52), and he timely filed his response to the NMCD Defendants' *Martinez* report one week later (Doc. 54). On July 8, 2020, the undersigned granted Urioste's pending motions to amend his complaint again in order to substitute Maciel for Trevizo, and the undersigned simultaneously granted the NMCD Defendants' motion to file a reply brief in support of their *Martinez* report. (*See* Doc.

---

[4] The new allegations and claims asserted in the First Amended Complaint, like the original allegations and claims, concerned conduct allegedly occurring in 2016. The NMCD Defendants have not raised any statute-of-limitations concerns or relation-back arguments concerning the allegations and claims first asserted in the First Amended Complaint.

[5] Due to earlier issues regarding lack of service on other parties, the NMCD Defendants are the only Defendants to have filed a *Martinez* report as of this date. The undersigned has already taken note of the lack of service on "Officer Cordova" and Maciel. Additionally, Defendants Ben Martinez, P.A., and Jose Martinez, M.D. have not yet entered this action. The undersigned has recently addressed the question of service on P.A. Martinez and Dr. Martinez in a separate order. (*See* Doc. 67).

60). The NMCD Defendants filed their reply brief on July 21, 2020. (Doc. 61). Urioste filed the

operative pleading (hereinafter the "Second Amended Complaint") on July 31, 2020. (Doc. 62).

Urioste also filed a sur-reply in opposition to the NMCD Defendants' filings. (Doc. 63).

## III.  LEGAL STANDARDS

### A.  SUMMARY JUDGMENT

Summary judgment is appropriate where the pleadings, discovery materials, and

affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an

effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in

favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986) (citations omitted). In ruling on a summary judgment motion, the Court

may neither make credibility determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245

F.3d 1172, 1175 (10th Cir. 2001) (quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it

alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall

v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). A *Martinez* report is also

treated as an affidavit, and this report can be used in determining whether to grant summary

judgment if it is "supported by affidavits or other materials provided under oath." *Id.* at 1110,

1111 (citations omitted). A court cannot resolve material disputed factual issues by accepting a

*Martinez* report's findings when the plaintiff has presented conflicting evidence. *Id.* at 1111.

However, conclusory allegations without specific supporting facts have no probative value and

cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143

(10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

As with all pleadings filed by pro se individuals, the Court must liberally construe the allegations contained in the plaintiff's pleadings. *Northington v. Jackson*, 973 F.2d 1518, 1520-21 (10th Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). However, the Court must apply the same legal standards applicable to pleadings drafted by counsel. *Id.*

## B.  Qualified Immunity

Additional steps are taken when a summary judgment motion raises a defense of qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* The court may consider either of these prongs before the other "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 772 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

The "clearly established" inquiry exists in part to protect officers who were mistaken as to what the law required at the time of the alleged constitutional violation, but whose mistake of law was reasonable. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001). Because the doctrine is intended to protect "all but the plainly incompetent or those who knowingly violate the law,"

summary judgment on the basis of qualified immunity is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Id.* at 202 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Ordinarily, a right is considered to be clearly established only when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted). Additionally, "'[g]eneral statements of law' can clearly establish a right for qualified immunity if they apply 'with obvious clarity to the specific conduct in question.'" *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

At the summary judgment stage, a court generally must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## III.  DISCUSSION

In their *Martinez* report, the NMCD Defendants contend that the undisputed factual record does not support any deliberate-indifference or retaliation claims against them, that they are entitled to qualified immunity on those claims in any event, and that the Court should therefore grant them summary judgment as to these claims. In light of the somewhat messy posture of the case, the undersigned first addresses certain procedural matters concerning the permissibility and impact of Urioste's Second Amended Complaint before turning to the merits of the NMCD Defendants' arguments.

### A.  ALLEGATIONS EXCEEDING SCOPE OF ALLOWED AMENDMENT

On July 8, 2020, the undersigned granted Urioste leave to amend his First Amended Complaint for the limited purpose of "omit[ting] Defendant Treviso, add[ing] Defendant Maciel, and exclud[ing] the claims and parties the Court [previously] dismissed." (*See* Doc. 60 at 2). The undersigned also permitted Urioste to clarify in his Second Amended Complaint "that he is suing all defendants in their individual and official capacities." (*See id.* at 1). The Court did not grant Urioste leave to amend his pleading on any other basis. (*See id.* at 1-2).

Urioste has complied with these directives for the most part, including only minor transcription differences between his First Amended Complaint and his Second Amended Complaint while otherwise making the aforementioned changes. Occasionally, though, Urioste peppers his newest pleading with conclusory allegations that did not appear in his First Amended Complaint. *Compare* (Doc. 24 at 8) ("The plaintiff continued to protest and ask for treatment for pain and nausea."), *with* (Doc. 62 at 13) ("The plaintiff continued to protest and ask for medical treatment for the sym[p]toms of gallbladder disease, extreme pain and nausea.") (additions underlined); *compare* (Doc. 24 at 10) ("[T]he health care provider would not authorize nothing

for severe pain management."), *with* (Doc. 62 at 18) ("[T]he health care provider would not authorize nothing for severe pain management (chronic pain).") (additions underlined). While outside the scope of the permitted amendment, conclusory allegations of this nature do not themselves present a serious problem since they have no bearing on a party's claims either at the pleadings stage or at summary judgment. *See, e.g.*, *Fitzgerald*, 403 F.3d at 1143 (quotation omitted) ("[S]ummary judgment cannot rest on purely conclusory statements either in pleading or in affidavit form."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (establishing that conclusory allegations are not entitled to presumption of truth at pleadings stage).

More problematically, Urioste has now included entirely new sections in his Second Amended Complaint, including one section entitled "Legal Claim" (Doc. 62 at 45).[6] In particular, the latter section adds a new Fifth Amendment Double Jeopardy claim (*see id.*) that has not been pleaded or even suggested in previous complaints. Although Urioste now argues that his allegations show that he received multiple forms of discipline for the same infraction in UMT and related proceedings (*see, e.g.*, Doc. 55 at 33, 35), the Tenth Circuit has repeatedly "held that, because the Double Jeopardy clause only applies to proceedings that are essentially criminal in nature, it is well established that prison disciplinary sanctions do not implicate double jeopardy protections." *See, e.g.*, *Barlor v. Patton*, 681 F. App'x 674, 678 (10th Cir. 2017) (unpublished) (quoting *Fogle v. Pierson*, 435 F.3d 1252, 1262 (10th Cir. 2006)) (cleaned up) (holding that Double Jeopardy claim based on prisoner's security classification was not viable). Moreover, from the outset, Urioste has consistently described this action as concerning "[d]enial of medical attention" and related "retaliation" and "due process" violations. (*See* Doc. 1 at 2, 4);

---

[6] Urioste's pleading also adds a new section called "Exhaustion of Legal Remedies." (Doc. 62 at 44-45). That portion of the Second Amended Complaint should also be stricken for the reasons discussed here, which should not prejudice Urioste because he was not required to plead exhaustion, *see Jones v. Bock*, 549 U.S. 199, 212-17 (2007), and because the NMCD Defendants have abandoned their exhaustion argument as discussed *infra*.

(*see also, e.g.*, Doc. 24 at 24) (citing Eighth Amendment and Fourteenth Amendment caselaw); (Doc. 62 at 46) (same). Consequently, Urioste's belated effort to assert a double jeopardy violation for the first time exceeds the scope of amendment previously permitted by the undersigned, and it fails to state a claim upon which relief may be granted. *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (futility of amendment justifies denial of leave to amend).

Federal courts will regularly strike allegations, claims, and even entire amended pleadings under Federal Rule of Civil Procedure 12(f) where that material exceeds the scope of an amendment permitted by the court. *See, e.g.*, *U.F.C.W. Local 56 Health & Welfare Fund v. J.D.'s Market*, 240 F.R.D. 149, 154 (D.N.J. 2007) (striking new defendant and new legal theories where plaintiffs obtained leave to amend for limited purposes but "failed to obtain leave to amend their complaint *in the manner in which they amended it*") (emphasis added); *see also Fodor v. Blakey*, No. CV 11-08496 MMM (RZx), 2012 WL 12893983, at *6 (C.D. Cal. June 15, 2012) (numerous citations omitted). Striking Urioste's unauthorized additions under Rule 12(f) "is appropriate here because to hold otherwise would be to essentially ignore Fed.R.Civ.P.15(a) and the requirement that a plaintiff seek leave before amending his complaint." *U.F.C.W. Local 56*, 240 F.R.D. at 154. Therefore, to the extent that the allegations in Urioste's Second Amended Complaint (Doc. 62) differ from those in his First Amended Complaint (Doc. 24) in any way other than (i) substituting Gary Maciel for Oscar Trevizo; (ii) clarifying that Urioste's claims are brought against the Defendants in their official and individual capacities; and (iii) eliminating claims and parties previously dismissed by the Court (*see* Doc. 60), the undersigned RECOMMENDS that the Court STRIKE those allegations pursuant to Rule 12(f).

### B.  MOOTNESS OF *MARTINEZ* REPORT

The fact that Urioste filed his Second Amended Complaint *after* the NMCD Defendants filed their *Martinez* report—which was directed at claims asserted in the First Amended Complaint—arguably creates a procedural tangle. "[I]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) (quotation omitted). Accordingly, any motion directed at the superseded complaint—including any pending summary judgment motion—is ordinarily rendered moot by the filing of an amended pleading. *See, e.g.*, *Klintworth v. Valley Forge Ins. Co.*, Case No. 20-CV-0178-CVE-FHM, 2020 WL 6994259, at *1 (N.D. Okla. July 10, 2020) (citations omitted).

In this case, however, the NMCD Defendants did not oppose Urioste's efforts to amend his pleading notwithstanding their pending *Martinez* report. (*See* Doc. 60 at 1) (noting lack of opposition). Further, because the Court only allowed limited amendments to the First Amended Complaint as described above, and because the undersigned has recommended that the Court strike any aspects of the Second Amended Complaint that exceed the permissible scope of amendment, the relevant allegations and claims asserted against the NMCD Defendants in the two pleadings (and addressed by the instant filings) are wholly indistinguishable. Under these particular circumstances, the efficient management of this case would be needlessly hindered if the parties were required to refile their *Martinez* report and responsive briefs simply because those filings are now technically moot. *Cf., e.g.*, *Bird v. Regents of N.M. State Univ.*, No. 08-cv-00851 BB/LAM, 2010 WL 11492347, at *2 (D.N.M. Dec. 28, 2010) (predicting that "relatively minor" differences between superseded and amended pleadings, and prospect of "needless[] delay," would weigh against finding pending summary judgment motions to be moot); *United*

*States v. Copar Pumice Co., Inc.*, No. 09-cv-01201 JP/RLP, 2010 WL 11475731, at *5 (D.N.M.

Nov. 12, 2010) (citing *Gotfredson v. Larsen LP*, 432 F. Supp. 2d 1163, 1172 (D. Colo. 2006))

(proceeding to evaluate motion to dismiss directed at superseded pleading where arguments

"apply equally to the Amended Complaint and the parties have treated the [motion] as applying

to the Amended Complaint"). Accordingly, the undersigned will evaluate the *Martinez* report

and responsive briefs thereto as they pertain to the Second Amended Complaint.

### C.  URIOSTE'S SURREPLY

This Court's Local Rules require leave of the Court before filing a surreply. *See*

D.N.M.LR-Civ. 7.4(b). Although the NMCD Defendants have stated that they would not be

opposed to Urioste being allowed to file a surreply (*see* Doc. 58 at 2), Urioste did not seek—and

the Court did not grant him—permission to do so before filing his surreply on August 7, 2020

(Doc. 63). Nevertheless, as detailed below, the NMCD Defendants' reply brief backtracks

significantly on their earlier argument concerning exhaustion of administrative remedies, and

substantial parts of Urioste's surreply are aimed at addressing that argument and other points

raised for the first time therein.

In the interests of justice, and in light of Urioste's pro se status, the undersigned

RECOMMENDS that the Court *sua sponte* GRANT Urioste leave to file his surreply *nunc pro

tunc* to August 7, 2020. Moreover, in assessing the NMCD Defendants' *Martinez* report, the

undersigned has considered the relevant arguments raised in Urioste's surreply.

### D.  UNIT MANAGER OSCAR TREVIZO

In his original and First Amended Complaint, Urioste identified "Oscar Treviso" as the

"unit manager" at PNM. (*See, e.g.*, Doc. 24 at 2). However, prior to the filing of the NMCD

Defendants' *Martinez* report, Urioste admitted that he was mistaken about the PNM unit

manager's identity and sought leave to again amend his complaint to substitute PNM Unit

Manager Gary Maciel as a Defendant. (*See* Doc. 38); (*see also* Doc. 34) (noting error). In their

*Martinez* report, the NMCD Defendants explain that Oscar Trevizo has worked continuously at a

different NMCD facility for thirty years and was not employed at PNM during the events alleged

in Urioste's pleadings. (*See, e.g.*, Doc. 44 at 7). Subsequently, Urioste again sought leave to

amend to substitute Maciel for Trevizo. (*See* Doc. 52). The Court granted leave to amend on this

basis (Doc. 60), and Urioste's operative Second Amended Complaint no longer alleges any

wrongdoing by Trevizo. (*See generally*, Doc. 62). Accordingly, the undersigned

RECOMMENDS that Defendant Trevizo be DISMISSED as a party to this proceeding.

## E.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

The Prison Litigation Reform Act ("PLRA") prohibits any action regarding prison

conditions from being brought by any prisoner until he has exhausted all administrative remedies

that are available. 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002)

(recognizing that exhaustion is required for any suit challenging prison conditions, regardless of

the cause of action). Because Congress has specifically mandated exhaustion of administrative

remedies, the Court cannot waive this requirement, even if the remedy sought is not actually

available to the prisoner through the administrative process. *Booth v. Churner,* 532 U.S. 731, 739

(2001) (citing *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). A prisoner must properly

complete the full administrative review process set by the facility's grievance policy in order to

exhaust administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford*

*v. Ngo*, 548 U.S. 81, 88 (2006)); *Thomas v. Parker*, 609 F.3d 1114, 1118 (10th Cir. 2010); *see*

*also Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (noting that it is not enough for a

prisoner to begin the grievance process without completing it).

A prisoner's failure to exhaust administrative remedies is an affirmative defense, *see Jones*, 549 U.S. at 216, that the defendant bears the burden of establishing, *see Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007) (citations omitted). Although the NMCD Defendants spend a significant portion of their *Martinez* report describing NMCD's grievance policies (*see* Doc. 44 at 17-20) and the procedural history of at least three of Urioste's grievances (*see id.* at 20-23), their legal argument regarding the exhaustion of "relevant" grievances consists of essentially two paragraphs concerning Grievance No. N-16-05-04 (*see id.* at 31). However, after Urioste produced evidence that he had indeed fully exhausted this grievance (*see, e.g.*, Doc. 55 at 63), the NMCD Defendants conceded in their reply brief that Urioste "has cleared the hurdle of grievance exhaustion regarding his claims that he did not receive adequate medical care for pain" (*see* Doc. 61 at 1-3).[7] While the NMCD Defendants state that their remaining "information . . . concerning Plaintiff's other grievances[] is unchanged" (*see id.* at 2), they raise no legal argument in either their *Martinez* report or their reply brief concerning those other grievances and the impact of their alleged unexhausted status on Urioste's claims.[8] Accordingly,

_____

[7] Urioste's evidence of exhaustion includes his copy of an unsigned, undated response to that grievance from NMCD's Director of Adult Prisons, as well as a January 2017 letter from Grievance Appeals Coordinator Steve Madrid acknowledging that the grievance was exhausted. (Doc. 55 at 62-63). It was Madrid himself, in an affidavit submitted with the NMCD Defendants' *Martinez* report, who incorrectly attested that Urioste had not properly appealed Franco's resolution of his grievance to the Director. (*See* Doc. 44-2 at 3). Madrid now attributes his original "oversight" to a failure to scan documents due to a "change in record-keeping practices which occurred soon after this grievance was exhausted." (Doc. 61-1 at 2-3). However, *the NMCD Defendants have still not submitted the Director's signed and dated response into the record*. Since the NMCD Defendants are now abandoning their exhaustion defense, the undersigned would be less troubled by this ongoing omission if this were the only relevant NMCD-generated document that the NMCD Defendants failed to submit with their *Martinez* report. But, as Urioste has shown, it is not. (*See, e.g.*, Doc. 55 at 17-21) (PBM records concerning contraband and fishing offenses); (*cf.* Doc. 62 at 36-40) (alleging that fishing allegations and cell shakedown for contraband constituted retaliation). The undersigned reminds the NMCD Defendants of their obligation to submit "*any* . . . documents relevant to any allegation or defense" when filing a *Martinez* report in the District of New Mexico. (Doc. 30 at 2) (emphasis added).
[8] The NMCD Defendants' reply brief implies in passing that Urioste somehow erred by failing to allege exhaustion as to conduct by Palomino. (*See* Doc. 61 at 9) ("Plaintiff does not allege exhaustion."). But again, failure to exhaust is an affirmative defense, and the burden is on the NMCD Defendants to establish non-exhaustion rather than on Urioste to allege otherwise. *See, e.g.*, *Jones*, 549 U.S. at 216.

the NMCD Defendants have not met their burden to establish failure to exhaust as an affirmative

defense, and the undersigned proceeds to consider the merits of Urioste's claims against them.

## F.  DELIBERATE INDIFFERENCE

The Tenth Circuit recognizes two broad types of deliberate indifference claims: those in

which a medical professional fails to properly treat a serious medical condition, and those where

"prison officials prevent an inmate from receiving treatment or deny him access to medical

personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205,

1211 (10th Cir. 2000). Because Defendant medical professionals Jose Martinez and Ben

Martinez are not parties to the instant *Martinez* report, the only type of claim presently at issue is

the second, concerning whether the NMCD Defendants prevented Urioste from receiving

treatment or denied him access to medical personnel. *See id.*

As to either type of claim, the standards concerning claims of deliberate indifference to a

prisoner's serious medical needs are well established:

> Deliberate indifference to serious medical needs of prisoners constitutes the
> unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.
> To state a cognizable Eighth Amendment claim, a prisoner must allege acts or
> omissions sufficiently harmful to evidence deliberate indifference to serious
> medical needs. The deliberate indifference test involves an objective and a
> subjective component. The objective component requires the plaintiff to allege the
> deprivation at issue was sufficiently serious. That is, the defendant's actions must
> result in the denial of the minimal civilized measure of life's necessities. The
> subjective component requires the prisoner to allege the official was deliberately
> indifferent to a serious medical need. A plaintiff sufficiently alleges a culpable
> mindset when the facts alleged show a prison official knows of and disregards an
> excessive risk to inmate health or safety; the official must both be aware of facts
> from which the inference could be drawn that a substantial risk of serious harm
> exists, and he must also draw the inference.

*Walker v. Mohiuddin*, 947 F.3d 1244, 1250 (10th Cir. 2020) (cleaned up).

Where, as here, a prisoner's allegations concern a *delay* in medical treatment rather than

an outright *denial* of treatment, the prisoner must show "that the delay resulted in substantial

harm" in order to establish that an official's deliberate indifference was "sufficiently serious" in order to satisfy the objective component of the Eighth Amendment test. *See Sealock*, 218 F.3d at 1210 (citation omitted). The Tenth Circuit has recognized that the substantial harm requirement is satisfied by a showing of "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (quotation omitted) ("Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'").

The NMCD Defendants argue broadly, without citation to pertinent authority, that Urioste "has not shown substantial harm" because "he has not shown the pain [he experienced prior to surgery] was different or more than any other person who might be waiting for gallbladder surgery to be scheduled." (Doc. 44 at 33). However, the crux of Urioste's claims is not that he experienced comparatively more pain than other similarly situated people, but that he experienced unnecessary severe pain because the surgery in question was improperly delayed. The NMCD Defendants' argument fundamentally misunderstands the role of the "considerable pain" showing: "[t]he point of the objective prong of the deliberate indifference test is to 'limit claims to significant, as opposed to trivial, suffering,'" not to establish that another person facing similar delays would have experienced a comparable amount of pain. *See Al-Turki*, 762 F.3d at 1193. In *Al-Turki*, the Tenth Circuit concluded that allegations of severe pain lasting for several *hours*, which allegedly could have been alleviated through earlier medical treatment, were sufficient to overcome summary judgment. *See id.* at 1193-94. Urioste repeatedly attests that he similarly experienced substantial pain for several *months* while waiting for surgery (*see, e.g.*,

Doc. 62 at 3), and the medical evidence presented thus far does not show otherwise. As in *Al-Turki*, that is enough to overcome the NMCD Defendants' blanket substantial-harm argument at this stage absent any further showing.

The NMCD Defendants also argue that Urioste has failed to show that any NMCD Defendant delayed his treatment or that any NMCD Defendant, either subjectively or objectively, "would have had reason to believe that Plaintiff was not receiving medical attention." (*See, e.g.*, Doc. 44 at 32). The undersigned considers the claims against each individual NMCD Defendant in turn.

*1. Perez and Trujillo*

Urioste lists four occasions in which Perez and/or Trujillo purportedly ignored his requests for medical assistance. On February 18, when Urioste asked to return to his cell due to nausea and fatigue, Trujillo told him to wait briefly until his rec time was over, at which point officers carried Urioste inside and he was seen by medical providers. (*See* Doc. 62 at 5-6). On March 29, Perez and Trujillo "refused" to call for medical help. (*Id.* at 37). On April 9, Perez and Trujillo never called for medical staff and allegedly sprayed mace in Urioste's cell even though Urioste had been calling for such assistance "all day"; no other details of this incident are provided. (*See id.*). On April 21, Perez again sprayed Urioste with mace following requests for medical assistance, with no other details provided. (*See id.* at 39).

The NMCD Defendants, while presenting no evidence disputing these events, argue that they do not amount to deliberate indifference. (*See* Doc. 44 at 10-12, 33). Urioste summarily refers to the February 18 incident in his responsive briefing but adds no new factual information

or evidence concerning that specific event. (*See* Doc. 55 at 15). Urioste does not add further argument regarding Perez's or Trujillo's alleged deliberate indifference in his responsive briefs.[9]

Assuming that the evidence here satisfies the objective prong of a deliberate indifference claim, Urioste has failed to show that either Perez or Trujillo knew of or disregarded an excessive risk to his health on any of these occasions. At no point does the record show, or does Urioste allege facts showing, that on any of these occasions Perez or Trujillo themselves were subjectively aware of any substantial risk to Urioste's health that might result from any delays in obtaining medical treatment for him. (*Cf.* Doc. 62 at 37, 39). Urioste's conclusory, generalized assertions that "the defendants witnessed" his symptoms on unspecified dates (*see, e.g.*, Doc. 55 at 23) do not establish with particularity that *these* individuals were aware of Urioste's particular medical needs at *these* specific times. Nor does any evidence in the record support the allegation that either Perez or Trujillo unduly delayed Urioste's receipt of medical care. Indeed, the allegations concerning the February 18 event demonstrate that Urioste was seen by medical personnel shortly after his complaints of nausea and fatigue to Trujillo. (*See* Doc. 62 at 6). And as to the alleged events of April 21, Urioste's own allegations indicate that he was actually seen by medical personnel on that date (*see id.* at 17), which appears to belie any suggestion that Perez unduly (or at all) delayed his medical treatment.

In the absence of any supporting evidence, Urioste has not shown that Perez and Trujillo violated his Eighth Amendment rights. Consequently, Perez and Trujillo are entitled to qualified immunity on Urioste's deliberate indifference claims against them, and summary judgment in their favor is proper.

---

[9] Urioste's sole reference to Perez in his response to the *Martinez* report concerns alleged food tampering by Perez and Trujillo. (Doc. 55 at 19-20). As Urioste does not refer to medical delays in making these allegations (*see* Doc. 62 at 39-40), the undersigned construes any food-tampering allegations as underlying his retaliation claims and will address them accordingly.

### 2. *Palomino*

Urioste alleges that Palomino "refused to call medical" on his behalf on February 28 (Doc. 62 at 36), without adding any further detail about the incident or his condition at that time in either his Second Amended Complaint or his responsive briefs. Evidence presented by the NMCD Defendants, and undisputed by Urioste, shows that he was triaged by a nurse the following day and underwent a more thorough examination one day later. (*See, e.g.*, Doc. 44-3 at 10-11). Again, in the absence of any evidence concerning what Palomino actually knew about Urioste's condition on February 28, and in the absence of any evidence of undue delay on Palomino's part, Urioste has not shown that Palomino acted with deliberate indifference. Palomino is therefore entitled to qualified immunity and summary judgment on this claim.

### 3. *Boyer*

Urioste alleges that he submitted informal grievances concerning his medical care to Grievance Officer Boyer on February 26, February 29, March 16, April 14, May 27, and June 15. (*See* Doc. 62 at 3, 33-35). Urioste further suggests that Boyer ignored a "complaint" labeled "Emergency Medical" that he submitted to Maciel on February 22. (*See id.* at 33) (noting that complaint "was filed" on that date); (*see also id.* at 43) (specifying that Urioste sent this complaint "directly to the Unit Manager Gary Maciel"). Urioste contends that Boyer acted with deliberate indifference to his serious medical needs by "ignor[ing] all complaints and grievances." (*See id.* at 35).

NMCD's "Inmate Grievances" policy provides that prisoners generally initiate the grievance process by filing an informal complaint with the unit manager, who must "make every

effort to resolve the complaint." (*See* Doc. 44-4 at 137).[10] If the unit manager's resolution of the informal grievance does not satisfy the prisoner, he may attach the informal grievance to a formal grievance and submit the documents to the facility's grievance officer. (*See id.* at 137-38). The grievance officer reviews the formal grievance for proper procedural compliance, then investigates and answers any proper grievance. (*See, e.g.*, *id.* at 140-41). The grievance officer subsequently delivers her report and recommendations to the warden, who makes a decision on her recommendations. (*Id.* at 141). After the warden's decision is reported to the prisoner, further appeals may be made to the Secretary of Corrections. (*See id.* at 134, 141-42).

Aside from Urioste's sworn allegations, the record in this case lacks any evidence of any informal or formal grievances concerning medical care filed on or about February 26, March 16, April 14, May 27, or June 15. (*See, e.g.*, Doc. 44-2 at 6-7) (Urioste grievance history). And Urioste now concedes in a self-maintained log of events that his alleged informal grievances of April 14 and May 27 pertained respectively to inmate property and religious services, not medical care. (*See* Doc. 55 at 65); (*see also* Doc. 44-2 at 11-12) (copy of April 14 grievance regarding property).[11] But even if Urioste had attempted to submit health-related informal grievances to Boyer on each of these dates as he attests, there is no evidence to suggest that she ever received them because informal grievances are routed to the unit manager, not the grievance officer. (*See* Doc. 44-4 at 137). For this reason, and because there is no record of Urioste submitting any such informal grievances to Boyer as part of a formal grievance, there is no

---

[10] Two versions of this policy were in effect over the course of relevant events (*see* Doc. 44-4 at 126-50, *id.* at 151-75), but those policy versions are functionally indistinguishable for present purposes. For the sake of simplicity, the undersigned cites solely to the earlier policy, which was in effect for most of the alleged events.

[11] As for the purported March 16 and June 15 informal grievance, Urioste's log only has the word "Medical" corresponding to those dates. (Doc. 55 at 65). These entries do not specify that they refer to *any* grievances, much less grievances submitted directly to Boyer. (*Cf. id.*).

evidence to suggest that Boyer was subjectively aware of any medical issues discussed therein. Urioste may not maintain a deliberate indifference claim against Boyer on these facts.

The evidentiary record does show that Urioste submitted informal grievances concerning his medical care to *Maciel*—not Boyer—on or about February 22 and February 29, and that it was Maciel who handled these grievances together at the informal stage. (*See* Doc. 44-2 at 18-20) (indicating receipt of informal grievances bearing those dates). Urioste expressly concedes as much in his allegations concerning the February 22 grievance (*see* Doc. 62 at 43), and contrary to his original suggestion, he now acknowledges that it was Maciel and not Boyer who took about "40 days" to respond to these two grievances (*see* Doc. 55 at 29-30). The record also establishes that Urioste first submitted these materials to Boyer as part of a formal grievance on or about May 3. (*See* Doc. 44-2 at 17).

For Boyer to be held liable for deliberate indifference, Urioste must establish that she was aware of facts from which the inference could be drawn that a substantial risk of serious harm could result from delay, that she drew that inference, and that she nonetheless disregarded the substantial risk. *See, e.g.*, *Sealock*, 218 F.3d at 1210 (finding subjective prong satisfied where defendant "knew of and disregarded the excessive risk to [plaintiff's] health that could result from the delay"); *Martinez*, 563 F.3d at 1089. Per NMCD policy, the earliest an informal grievance normally is brought to the grievance officer's attention is on the date that the unit manager resolves it. (*See* Doc. 44-4 at 137). With respect to Urioste's February 22 and February 29 complaints, that date was May 3, (*see* Doc. 44-2 at 18, 20) (noting Maciel's resolution of grievances on that date), the same day that he submitted his formal grievance to Boyer. No evidence in the record suggests that Boyer had any knowledge of any of Urioste's relevant medical issues prior to that date. *See, e.g.*, *Bird v. Lampert*, 839 F. App'x 218, 223 (10th Cir.

2020) (unpublished) (affirming summary judgment on deliberate indifference claim where plaintiff "does not cite any evidence that [grievance officer] was aware of the delay before he filed his grievance or that she had any involvement in, or prior knowledge of," medical staffing shortages). Because there is no evidence that Boyer had any awareness of his medical circumstances—or even the existence of his health-related informal grievances—prior to May 3, Urioste has not satisfied the subjective prong of any deliberate indifference claim against Boyer concerning conduct prior to that date.

Nor is there any support in the record for a deliberate indifference claim against Boyer for her conduct on or after May 3. Rather than showing delay, the record establishes that Boyer reviewed Urioste's formal grievance for proper procedural compliance and accepted it for consideration within three working days (*see* Doc. 44-2 at 17); that she contacted PNM medical personnel that same morning (*id.* at 16); that medical personnel responded by outlining some of Urioste's most recent treatment for his condition and noting that he was scheduled for another examination that day (*id.* at 15); and that Boyer submitted a recommendation on Urioste's grievance on the same day that she heard back from his medical providers (*id.* at 14). Nothing in the applicable NMCD policies suggests that Boyer was required to do anything further in her capacity as grievance officer. (*See, e.g.*, Doc. 44-4 at 138) (outlining grievance officer responsibilities). Indeed, having confirmed that Urioste was receiving medical treatment that was intended to address the conditions he complained of, it would have been improper for Boyer to substitute her judgment for that of his treating medical professional. Therefore, the undisputed material record fails to establish that Boyer was aware of facts allowing for an inference that Urioste faced a substantial risk of serious harm, that she in fact drew such an inference, or that she acted with delay in disregard of that substantial risk.

The only particularized argument Urioste raises concerning Boyer's alleged delay[12] is to contend that Boyer should have acted more quickly because he marked his February 22 informal grievance (which formed part of the basis of his May 3 formal grievance) with the label "Emergency Medical!!" (*See, e.g.*, Doc. 55 at 5, 21-22, 28); (Doc. 63 at 3-4). NMCD policy does establish an expedited procedure for emergency grievances where (1) the prisoner submits a *formal* grievance form (Form CD-150501.1) directly to the grievance officer; (2) he designates the grievance as an emergency; (3) his grievance "demonstrate[s] the factors creating a risk that serious harm may result if the emergency grievance is processed according to standard time limits"; and (4) the grievance officer "determine[s], through investigation, [that] the inmate's grievance is, in fact, an emergency grievance." (Doc. 44-4 at 135). But here, contrary to this policy, Urioste submitted his purported "emergency" grievance directly to *Maciel*, not Boyer (*see, e.g.*, Doc. 62 at 43), on an *informal* grievance form (*see* Doc. 44-2 at 18); (*cf.* Doc. 44-4 at 146-47) (blank formal grievance form). Additionally, rather than demonstrating the existence of "a risk that serious harm may result" in the absence of immediate future action, Urioste's own grievance narrative describes a retrospective problem, specifically stating that his "main issue . . . [was] being laughed at by medical staff and [being] ignored" prior to receiving treatment. (*See* Doc. 44-2 at 18-19). Even if Urioste had otherwise properly followed emergency grievance procedures, there is no reason to believe that any investigation of that grievance would have revealed an unresolved emergency because Urioste was seen by medical providers on *the same day* that the grievance was filed, was hospitalized for two days, and received medical care on multiple dates shortly thereafter. (*See, e.g.*, Doc. 44-3 at 8-12) (showing medical examinations

---

[12] The undersigned disregards Urioste's allegation that Boyer "ignored all complaints" (*see* Doc. 62 at 35) because he acknowledges in his own exhibits that he received a response to his May 3 formal grievance (*see* Doc. 55 at 61). *See Vette*, 989 F.3d at 1164-65 (citing, *e.g.*, *Scott*, 550 U.S. at 380) (resolving inconsistencies at summary judgment in favor of plaintiff's "objective documentary evidence" that "blatantly contradict[ed]" her own account).

on February 22-24, February 29, March 6); *cf. Carter v. Bravo*, 09-cv-00573 BB/GBW, 2010 WL 11623440, at *12 (D.N.M. May 27, 2010) (rejecting deliberate indifference claim concerning "emergency" complaint against grievance officer who "should be able to rely on the fact that [plaintiff] was evaluated twice by [medical provider] who apparently did not consider [his] issues an emergency"), *PFRD adopted*, (Doc. 19) (D.N.M. June 24, 2010). These undisputed facts do not suggest that Boyer was subjectively aware of any purported "emergency" situation; rather, they show that Urioste himself failed to follow emergency-grievance protocols.

More to the point, it is well established that a mere violation of prison policy or regulations, absent a violation of federal law, is insufficient to establish liability under § 1983. *See, e.g.*, *Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) (finding no cognizable § 1983 claim for "alleged violations of . . . prison regulations"); *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."). Even if Boyer had failed to follow governing NMCD emergency grievance procedures—which does not appear to be the case—such a failure does not alone establish an improper delay in medical treatment for Eighth Amendment purposes. The same reasoning applies to Urioste's belated argument that Boyer failed to follow other timelines set forth in the NMCD grievance policy. (*See, e.g.*, Doc. 63 at 16-19).

In summary, Urioste cannot sustain a deliberate indifference claim against Boyer for her alleged failure to respond to informal grievances where, in light of governing NMCD policy, there is no evidence that she received those grievances, that she was aware of their contents, or that the grievances had anything to do with medical care. To the extent that Urioste did properly submit relevant health-related grievances to Boyer, there is no evidence that she was aware of

their contents before he did so, and there is no evidence of undue delay or the requisite subjective awareness on her part after he did so. Accordingly, Boyer is entitled to qualified immunity and to summary judgment on Urioste's Eighth Amendment claims against her.

### 4. Franco

Urioste alleges that Warden Franco never responded to "letters" and informal "complaints" sent directly to him concerning Urioste's medical care on March 26, April 7, May 16, June 16, and June 22.[13] (Doc. 62 at 30-32). Urioste also suggests that Franco did not adequately act on his formal grievance concerning medical care. (*See id.* at 31).[14] Urioste contends that Franco's failures to act amounted to deliberate indifference, and he hints that this deliberate indifference contributed to a delay in his receipt of necessary medical treatment. (*See id.* at 32). The NMCD Defendants do not directly dispute Urioste's factual allegations, but they argue that Urioste has not established that Franco was subjectively aware of any serious medical condition, that he delayed Urioste's medical care, or that he otherwise acted improperly with respect to Urioste's serious medical needs. (*See* Doc. 44 at 7, 15, 33); (Doc. 61 at 6-7).

Franco in his individual capacity may not be held liable to Urioste based simply on the action or inaction of his subordinates, since § 1983 does not authorize liability on a theory of *respondeat superior. See, e.g.*, *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011); *see also Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1153 (10th Cir. 2006) (permitting liability based "upon active unconstitutional behavior," rather "than a mere right to control employees").

---

[13] Although Urioste also alleges that he sent a complaint to Franco on July 7 (*see* Doc. 62 at 31-32), his own evidentiary submission indicates that this complaint concerned religious matters, not his medical care (*see* Doc. 55 at 78). *See Vette*, 989 F.3d 1154, 1164-65 (10th Cir. 2021) (citing, *e.g.*, *Scott*, 550 U.S. at 380).

[14] Urioste originally alleged that he submitted this "formal appeal to Warden G. Franko" on July 5. (Doc. 62 at 31). However, the grievance was actually resolved by Franco on June 22 (*see* Doc. 44-2 at 14), and documents provided by Urioste show that his July 5 appeal was in fact an appeal of Franco's decision to the Director of Adult Prisons. (*See* Doc. 44 at 61-63) (*see also* Doc. 44-4 at 141-42) (describing warden's action on formal grievances and appeals thereto). The undersigned liberally construes Urioste's claim as attacking Franco's adoption of Boyer's recommendation as to his formal grievance on June 22.

Instead, Urioste must show that Franco personally participated in a violation of his constitutional rights in order to hold him liable. *See, e.g.*, *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  To the extent that he intends to establish Franco's liability on a supervisory basis, this means he must show that "(1) [Franco] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish" deliberate indifference. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Merely playing "a passive role in the alleged constitutional violation" will not suffice; rather, liability may only attach to Franco in a supervisory capacity if evidence shows that he "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive" Urioste of necessary treatment for a serious medical need. *See Pemberton v. Patton*, 673 F. App'x 860, 868-69 (10th Cir. 2016) (unpublished) (quoting *Dodds*, 614 F.3d at 1195-96, 1204).

As an initial matter, Franco's disposition of Urioste's grievance (*see also* Doc. 44-2 at 14), standing alone, will not suffice to demonstrate personal participation in any constitutional infirmity. *Cf. Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citations omitted) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983."). But more broadly, Urioste cannot prevail on his claim against Franco because the record here does not show that Franco acted with the culpability needed to support a deliberate indifference claim.

The undersigned finds instructive the analysis of the Honorable Gregory B. Wormuth, United States Magistrate Judge, in *Carter v. Bravo*. In that action, as here, a prisoner alleged that he wrote a letter to his facility's warden about delays in medical treatment after previously submitting a grievance about the matter. *See Carter*, 2010 WL 11623440, at *13-14. In

considering the prisoner's deliberate indifference claim against the warden, Judge Wormuth enumerated several important facts, including that  (1) the prisoner told the warden that he believed he needed surgery quickly; (2) despite this assertion, his communications with the warden did not utilize the facility's emergency grievance system; (3) the text of these communications did not indicate that an emergency existed; (4) a review of medical record generated prior to his communications to the warden would have indicated that medical providers had already treated the prisoner for this issue several times; (5) the prisoner was also seen by medical personnel not long after the warden allegedly learned about his condition; and (6) there was no allegation or evidence that the warden "had any control over when the off-site surgery was scheduled." *See id.* at *12-14. Based on these and other facts, Judge Wormuth concluded that the warden had not been deliberately indifferent to the prisoner's serious medical needs. *See id.* at *14.

While there are minor differences between the two cases, Judge Wormuth's reasoning in *Carter* remains applicable here in light of the substantial factual similarities. First, although Urioste did label one of his informal grievances as an emergency, an observer would have been entitled to conclude that no emergency was present because Urioste did not utilize NMCD's emergency process and because, as noted, his backwards-looking grievance did not actually describe an ongoing emergency. (*See* Doc. 44-2 at 18-19); *cf. Carter*, 2010 WL 11623440, at *14 ("[T]he text of Mr. Carter's complaints do[es] not communicate a medical emergency"). Second, Urioste did not designate his subsequent informal or formal grievances on the same issues as emergencies, which would suggest to an observer that his situation was not especially dire. *Cf. Carter*, 2010 WL 11623440, at *13 (finding it relevant that "Mr. Carter filed a second informal grievance . . . and a formal grievance" but "did not designate either as an emergency"). Third,

once Franco was purportedly notified of Urioste's complaints, a review of prior and subsequent

medical records would have revealed to him that—far from ignoring his condition—medical

personnel had examined and/or treated Urioste for his gallbladder-related symptoms on February

17-20 (Doc. 44-3 at 5-7), February 22-24 (*id.* at 8-9), March 1 (*id.* at 11), March 6 (*id.* at 12),

March 26 (*id.* at 13-14), April 2 (*id.* at 15-17), April 4 (*id.* at 18), May 16 (*id.* at 19), May 26 (*id.*

at 20), June 3 (*see id.* at 22), June 6 (*id.* at 21), June 27 (*id.* at 26), July 3 (*id.* at 27), and July 8

(*id.* at 28-29), among other dates. Fourth, Franco would have been entitled to rely on the medical

judgment of healthcare personnel who, judging from their notes, never considered Urioste's

situation to be an emergency requiring speedier treatment on any of these occasions. (*See id.*);

*see also Carter*, 2010 WL 11623440, at *14 ("[The warden] should be able to rely on the fact

that Mr. Carter was twice evaluated by the on-site dentist who apparently did not consider Mr.

Carter's issues an emergency."); *cf. Broadus v. Corr. Health Partners, Inc.*, 770 F. App'x 905,

909 (10th Cir. 2019) (unpublished) (citing, *e.g.*, *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th

Cir. 2006)) ("[P]risoners do not have [an] Eighth Amendment right to a particular course of

treatment."). Fifth, Urioste has provided no evidence that any of his letters to Franco indicated an

immediate need for surgery, and he alleges nothing to that effect. (*See* Doc. 62 at 30-32); *see*

*also Carter*, 2010 WL 11623440, at *14 ("Nothing in Mr. Carter's letter or grievances

demonstrated some emergency so acute that a ten-day delay would demonstrate deliberate

indifference to a substantial risk of serious harm."). Finally, even if this were not the case,

"Plaintiff has not alleged, and the evidence does not suggest, that [Franco] had any control over

when the off-site surgery was scheduled." *See Carter*, 2010 WL 11623440, at *14.

On the undisputed factual record before the Court, "[Franco] has carried his burden of

proving that there are no genuine issues of material fact with regard to whether he possessed a

sufficiently culpable state of mind." *See id*. Moreover, this record does not show that Franco personally, affirmatively participated in any alleged unconstitutional delay in providing medical care to Urioste, that Franco created or promulgated any policy resulting in a denial or delay of Urioste's medical care, or that Franco had any control whatsoever over the timing of the surgery that Urioste claimed to need. *See id.*; *see also, e.g.*, *Dodds*, 614 F.3d at 1199. Because this record does not establish a constitutional violation, Franco is entitled to qualified immunity and summary judgment on Urioste's deliberate indifference claims against him.

5.  *Olivas*

Urioste's claims against Deputy Warden Olivas are essentially identical to his claims against Franco, with no independent basis for liability asserted. (*See* Doc. 62 at 30-32) (alleging letters sent to Franco, then alleging that similar demands were sent to Olivas "[o]n each of the above dates" except one). The record includes no evidence suggesting that Olivas was any more deliberately indifferent to Urioste's serious medical needs than was Franco. Because the undisputed factual record does not support a deliberate indifference claim as to Franco, it necessarily supports no such claim as to Olivas. Qualified immunity therefore protects Olivas, and summary judgment in his favor is proper.

6.  *Conclusion*

The record before the Court fails to establish that any of the NMCD Defendants violated Urioste's Eighth Amendment rights. For this reason, the undersigned recommends that the Court grant each of the NMCD Defendants summary judgment as to Urioste's deliberate indifference claims against them.

## G. RETALIATION

Urioste alleges that various NMCD Defendants retaliated against him for seeking medical care and/or filing grievances concerning those and other efforts. "Prison officials may not retaliate against prisoners for exercising their constitutional rights, including filing internal prison grievances" and seeking medical care. *See Williams v. Allred*, 611 F. App'x 491, 495 (10th Cir. 2015) (unpublished) (citing *Fogle*, 435 F.3d at 1264); *cf. also, e.g.*, *Witmer v. Powell*, 114 F. App'x 372, 375 (10th Cir. 2004) (unpublished) (affirming summary judgment on claim alleging retaliation for seeking necessary medical care). To establish a retaliation claim, Urioste must show (1) that he was engaged in constitutionally protected activity, (2) that the relevant NMCD Defendant(s) caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the Defendants' adverse reaction was "substantially motivated" as a response to Urioste's protected conduct. *See, e.g.*, *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). The third prong requires a showing that, "but for" the Defendants' improper retaliatory motive, the disciplinary action would not have taken place. *See Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quotation omitted). Urioste "must allege specific facts showing retaliation because of the exercise of [his] constitutional rights." *Id.* (quotation omitted).

Although Urioste prefaces his relevant factual narrative with the allegation that he "suffered extreme retaliation . . . for vigorously pursuing medical attention" (Doc. 62 at 35), generalized conclusory allegations of this nature are not sufficient to state a retaliation claim, *see Iqbal*, 556 U.S. at 678, much less to overcome a showing of entitlement to summary judgment, *see Fitzgerald*, 403 F.3d at 1143. Because the bulk of Urioste's retaliation claims rely on such conclusory allegations, the undersigned recommends summary judgment as to most of these

claims.[15] However, because Urioste has established that genuine disputes of material fact exist as to other retaliation claims, and because the NMCD Defendants have not shown otherwise, summary judgment as to those claims is precluded.

    *1.  Labeling Urioste a "Rat"*

    In his sworn pleading, Urioste attests that Palomino entered his pod on June 14 and called him a "rat" in front of other prisoners due to his filing of "complaints for rec and medical and sick calls," resulting in concern that Palomino had "put[] the plaintiff's life in danger." (Doc. 62 at 40). In his response brief, Urioste clarifies that he filed an internal grievance against Palomino no more than two weeks before the aforementioned incident and that this grievance had resulted in Palomino's discipline. (*See* Doc. 55 at 46); *see also, e.g.*, *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) ("[I]t might be appropriate for a court to consider additional facts or legal theories asserted in a response brief to a motion to dismiss if they were consistent with the facts and theories advanced in the complaint."). Urioste further states that after being disciplined, Palomino labeled both him and a neighboring prisoner as "rats," promised to "show you tomorrow," and then "assaulted [his] neighbor" the next day. (Doc. 55 at 46). The NMCD Defendants argue in conclusory fashion that such allegations "are not credible" (Doc. 44 at 32)

---

[15] Urioste argues that he is facing difficulty gathering records and testimony from other prisoners in support of his claims since "it has been 4 years and some witnesses have been transferred . . . or released from the D.O.C." (Doc. 55 at 32, 38). However, since Urioste does not expressly request more time to gather this evidence, and in fact states that he "believes he has shown adequate documentation to move forward" (Doc. 63 at 1), the undersigned does not construe his statement as invoking Federal Rule of Civil Procedure 56(d). *See Hartford Cas. Ins. Co. v. Trinity Univ. Ins. Co. of Kan.*, 153 F. Supp. 3d 1323, 1334 (D.N.M. 2015) (citing *Lewis v. Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990)) ("Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable."). Even had Urioste properly invoked Rule 56(d), however, such relief would be inappropriate since Urioste has failed to identify the probable facts not available or to state with specificity how any requested time would enable him to meet his burden in opposing summary judgment. *See Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992) (citations omitted). Finally, given that this action has been pending for the better part of the past five years, the undersigned concludes that Urioste's failure to obtain evidence in support of his claims during this lengthy period supports a finding of dilatory conduct. *See id.* (disfavoring dilatory Rule 56(d) motions).

and that they do not establish retaliation in any event (*see* Doc. 61 at 9). The NMCD Defendants

have otherwise submitted no evidence directly relevant to this claim.

For present purposes, Urioste has satisfied the first element of a retaliation claim because

he has attested, and the NMCD Defendants do not dispute, that he "was filing complaints"

against Palomino. *See, e.g.*, *Fogle*, 435 F.3d at 1263-64 (internal grievances satisfy first element

of retaliation claim). Urioste has also satisfied the third element of such a claim because he has

attested, again without genuine dispute,[16] that Palomino's purportedly adverse actions were done

specifically in response to, and shortly after, the filing of these grievances. *See Shero*, 510 F.3d

at 1203; *Peterson*, 149 F.3d at 1144; *see also Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir.

2010) (finding substantial-motivation element satisfied where defendant was allegedly aware of

protected activity complaining of his conduct and took adverse action against plaintiff "in close

temporal proximity to the protected activity"). The remaining question is whether, construing the

undisputed record in the light most favorable to Urioste, Palomino's actions amounted to an

injury sufficient to chill an ordinary person from filing grievances under similar circumstances.

*See Shero*, 510 F.3d at 1203.

In a related context, at least one court has concluded that "[a] single prison official

verbally labeling an inmate a 'rat,' one time, does not support an inference of 'threats or

intimidation that reasonably would prevent the inmate from pursuing administrative remedies.'"

*See Pemberton v. Patton*, No. CIV-14-129-D, 2015 WL 1638638, at *30 (W.D. Okla. Apr. 13,

2015) (quoting *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)) (dismissing claim as

unexhausted despite allegation that plaintiff was deterred from using grievance process when

---

[16] Despite the NMCD Defendants' insistence that Urioste's claims "are not credible" (Doc. 44 at 32), "[i]t is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment," *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000), particularly where no evidence in the record rebuts the allegedly non-credible witness's statements made under penalty of perjury.

officer called him a "rat" for filing earlier grievance). Conversely, in the context of Eighth Amendment claims, the Tenth Circuit has recognized that it is clearly established that "labeling an inmate a snitch . . . constitutes deliberate indifference to the safety of that inmate" and that a prisoner's resulting psychological injury can suffice to support such a claim. *See Benefield v. McDowall*, 241 F.3d 1267, 1271-72 (10th Cir. 2001). Other courts have also denied summary judgment on retaliation claims against officers who labeled prisoners as "snitches" in response to their exercise of constitutional rights. *See Phillips v. Steinbeck*, No. 06-cv-02569-WDM-BNB, 2009 WL 2055188, at *3 (D. Colo. July 13, 2009); *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1221-22 (D. Colo. 2001) (denying dismissal and summary judgment on claim that officers labeled plaintiff "snitch" in retaliation for litigation); *see also Valandingham v. Bojorquez*, 866 F.2d 1135, 1137-39 (9th Cir. 1989) (reversing grant of summary judgment on retaliation claim where prisoner labeled "snitch" for filing grievances); *cf. Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (per curiam) (reversing dismissal of retaliation claim on allegations that prison officials labeled plaintiff "snitch" due to prior lawsuits); *Wilson v. Tolentino*, No. 19-cv-03084-CMA-NRN, 2020 WL 6119541, at *5 (D. Colo. Apr. 9, 2020), *R&R adopted*, 2020 WL 5559472 (D. Colo. Sept. 17, 2020) (holding that accusation that prisoner "narced" and was a "rat" established retaliatory intent). Notably, the Tenth Circuit's decision in *Benefield* relied in part on some of the aforementioned out-of-circuit retaliation decisions. *See* 241 F.3d at 1271 (citing, *e.g.*, *Valandingham*, 886 F.2d at 1138-39, and *Harmon*, 728 F.2d at 1409).

In light of these authorities and the failure of the NMCD Defendants to submit evidence relevant to this claim, and liberally construing Urioste's stated concern that Palomino's conduct "put[] [his] life in danger" (Doc. 62 at 40), the undersigned concludes that a question of material fact remains as to whether Palomino's public labeling of Urioste as a "rat" resulted in a

psychological "injury that would chill a person of ordinary firmness" from filing grievances against corrections officers. *See Shero*, 510 F.3d at 1203. Moreover, although the NMCD Defendants have invoked the defense of qualified immunity (*see* Doc. 44 at 34), the Tenth Circuit's reasoning in *Benefield* applies "with obvious clarity to the specific conduct in question." *Halley*, 902 F.3d at 1149 (quoting *Hope*, 536 U.S. at 741). The Tenth Circuit, like other courts, has straightforwardly held that it is clearly established "that labeling an inmate a snitch has the potential for great harm and may violate constitutional guarantees." *Benefield*, 241 F.3d at 1271; *see also Miller v. Leathers*, 913 F.2d 1085, 1088 n.* (4th Cir. 1990) (citing *Harmon*, 728 F.2d at 1409) ("It is impossible to minimize the possible consequences to a prisoner of being labelled a 'snitch.'"). If any reasonable officer would understand that the psychological injury from such conduct may rise to the level of a compensable wrong under the Eighth Amendment, *see id.* at 1271-72, then any such officer would likewise be on notice that an injury of that nature may chill a prisoner from engaging in the protected activity that allegedly motivated that conduct. Indeed, at least one district court considering a claim of this nature has persuasively reached the same conclusion. *See Phillips*, 2009 WL 2055188, at *2-4 (denying qualified immunity on First and Eighth Amendment claims concerning, *inter alia*, officer labeling prisoner a "snitch").

Genuine disputes of fact exist as to whether Urioste engaged in constitutionally protected activity, whether Palomino's conduct caused him an injury that would chill an ordinary person from engaging in that activity, and whether Palomino's conduct was substantially motivated by his protected activity. To the extent that Urioste's retaliation claim is premised on this conduct, summary judgment is improper.

*2.  Use of Mace*

For the most part, the viability of Urioste's claims regarding the use of mace against him in April and May 2016 is more straightforward. Urioste first alleges that he was sprayed with mace by Trujillo and Palomino on April 9 "after requesting medical all day." (Doc. 62 at 37). Similarly, Urioste claims without further elaboration that he was sprayed with mace by Perez on April 21 and by Perez and Trujillo on April 29, both times after requesting medical help. (*Id.* at 38, 39-40). Aside from the aforementioned conclusory allegation of "extreme retaliation" (*id.* at 35) and a suggestion of temporal proximity, Urioste alleges no retaliatory nexus between his requests for medical care and the officers' use of mace. *See, e.g.*, *Trant v. Oklahoma*, 754 F.3d 1158 (10th Cir. 2014) ("[T]emporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive.") In the absence of "specific facts" showing retaliatory conduct or intent, the NMCD Defendants are entitled to summary judgment on this claim. *See Peterson*, 149 F.3d at 1144.

Urioste's retaliation claim against Trujillo concerning the use of mace on May 11 finds even less support in the record. (*See id.* at 40). In this instance, Urioste does not allege that he called for medical assistance or engaged in any other protected activity, and rather than showing retaliatory motive, he alleges that Trujillo sprayed him with mace "for no reason." (*Id.*). It is not clear that Urioste actually intended for these allegations to support a retaliation claim; to the extent that he did, Trujillo is entitled to summary judgment on that claim.

The events of April 20 present a different situation. Urioste claims that on that date, after he requested medical attention, Palomino "arbitrarily" sprayed mace through his chow port and laughed, "Can't call for medical now." (Doc. 62 at 38). The NMCD Defendants, arguing in conclusory fashion that "[c]orrectional officers do not 'arbitrarily' spray inmates," speculate that

"[p]ossibly, there was an event in Plaintiff's pod that called for use of chemical restraint." (Doc. 44 at 10 n.7). While that cursory argument could succeed when paired with an appropriate factual showing, the NMCD Defendants offer no *evidence* suggesting that there is no genuine dispute as to the absence of retaliatory motive. At present, the only evidence of record concerning this incident is Urioste's sworn statements concerning both Palomino's comment, which expressly tied the use of mace to Urioste's requests for medical care, and the temporal proximity between those events. Construing these facts in the light most favorable to the nonmoving party, the undersigned finds that Urioste has established a genuine dispute as to whether Palomino's use of mace was substantially motivated by Urioste's constitutionally protected requests for medical care. Further, Urioste's sworn (and undisputed) allegation that Palomino's conduct left him "chok[ing] and struggl[ing] to breathe" (Doc. 62 at 38) suffices to show a genuine dispute of fact as to whether he suffered an injury that would chill an ordinary person from continuing to engage in protected activity. *Cf., e.g.*, *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quotation omitted) (denying qualified immunity on protestors' claims retaliation against officer where it was undisputed that "pepper spraying someone in the face 'would chill a person of ordinary firmness'") *Garcia v. Jaramillo*, No. 05-cv-01212 JB/RLP, 2006 WL 4079681, at *16-17 (D.N.M. Nov. 27, 2006) (denying summary judgment and qualified immunity on claim that officer sprayed arrestee in face due to protests protected under First Amendment, as evidence showing officer "spray[ed] someone in the face with mace and then arrest[ed] them . . . meets the second element of a retaliation claim," but granting summary judgment to officer on evidence that the detained plaintiff was "non-compliant and combative"). Finally, because it is clearly established that prison officials may not retaliate against prisoners

for engaging in protected conduct, *see* Peterson, 149 F.3d at 1144, qualified immunity as to this claim is unavailable.

On this record, in the absence of any relevant evidentiary showing whatsoever by the NMCD Defendants, summary judgment on Urioste's retaliation claim against Palomino concerning the use of mace on April 20 is not warranted. However, as to all other retaliation claims concerning the use of mace against Urioste, the undersigned recommends that the Court grant summary judgment in favor of the NMCD Defendants.

   *3. Discipline*

Several of Urioste's retaliation claims concern discipline he received for various infractions. However, as Urioste acknowledges (Doc. 55 at 35), most of these infractions—specifically a March 15 contraband discovery, a fishing incident on March 22, and a second fishing incident on March 24—together resulted in the revocation of good-time credit. (*See* Doc. 55-1 at 11) (justifying revocation due to contraband and fishing infractions). It is well established that where favorable judgment on a prisoner's § 1983 claim concerning prison discipline would "imply the invalidity of the deprivation of good-time credits," and thereby "necessarily demonstrate the invalidity of confinement or its duration," such a claim is barred unless the prisoner establishes that the disciplinary conviction has been overturned. *See, e.g.*, *Kilman v. Williams*, 831 F. App'x 396, 398 (10th Cir. 2020) (unpublished) (citing, *e.g.*, *Edwards v. Balisok*, 520 U.S. 641. 646 (1997)); *cf. Heck v. Humphrey*, 512 U.S. 477 (1994) (requiring dismissal of § 1983 claim that would "necessarily imply the invalidation of [a] conviction or sentence" that has not been overturned). While commonly applied to due process challenges raised by prisoners, this rule has equal application to retaliation claims under § 1983. *See, e.g.*, *Brown v. Cline*, 319 F. App'x 704, 705-06 (10th Cir. 2009) (unpublished) (affirming dismissal of

retaliation claim under *Edwards*); *Roberts v. Champion*, 91 F. App'x 108, 110 (10th Cir. 2004) (unpublished) (same). Here, Urioste has not shown or even alleged that the disciplinary convictions concerning his March 15, March 22, and March 24 infractions have been invalidated. As such, the NMCD Defendants are entitled to summary judgment on any retaliation claim premised on the events surrounding those three disciplinary convictions.

But even if those claims were not barred by *Edwards*, summary judgment would still be required. As to the contraband infraction, Urioste originally alleged that Perez and Trujillo "destroyed" his cell during the March 15 shakedown that resulted in the contraband discovery. (Doc. 62 at 36); (*see also* Doc. 44-2 at 106). However, the NMCD Defendants have submitted evidence in support of their *Martinez* report showing that it was two other officers, who are not Defendants to this lawsuit, who conducted the shakedown. (*See* Doc. 44-2 at 103-08). Urioste now appears to implicitly concede that officers other than Perez and Trujillo searched his cell on that date. (*See* Doc. 55 at 50) (discussing shakedown and one officer involved). Additionally, Urioste's claim that this action constituted retaliation is only supported by his aforementioned conclusory allegation of "extreme retaliation" (*see* Doc. 62 at 35), which is not enough to establish entitlement to relief, *see Peterson*, 149 F.3d at 1444.

With respect to the March 24 incident, Urioste alleges that Perez and Trujillo's fishing report on March 24 was made as retaliation for his requests to see medical providers "all day." (*See id.* at 37); (*see also* Doc. 55-1 at 19, 21) (showing date of incident(s)). Aside from this conclusory allegation, Urioste alleges no specific facts showing retaliatory intent. He does not deny that he was engaged in fishing on this date, and he acknowledges that the consequences of the officers' report were actually imposed by *Maciel* following review by the UMT. (*See* Doc. 62 at 37). Urioste also acknowledges that he spoke to the "med. pass nurse" on that date and was

seen by the sick call nurse two days later (*see id.* at 16), which strongly suggests that the officers passed along Urioste's request for medical assistance and that the fishing report was unrelated to that request. Given that Perez and Trujillo reported Urioste for conduct that he does not deny, and given that his requests for medical assistance were apparently not ignored, the circumstances presented here do not show a retaliatory motive and do not establish retaliation.

As to the March 22 incident, Urioste alleges that Perez lodged "false allegations" of fishing. (Doc. 62 at 36); (*see also* Doc. 55-1 at 19, 21) (showing date of incident). However, Urioste appears to claim that it was Maciel's punishment for that offense, rather than Perez's purportedly false allegations, that amounted to retaliation for his requests for medical attention. (*See* Doc. 62 at 36) (complaining of retaliation in the form of being "taken to a U.M.T." hearing by unnamed officers and Maciel revoking privileges). But even if this were not the case, Urioste does not allege any medical requests or other protected conduct preceded Perez's "false allegations," and again, the record shows that Urioste spoke with a "med. pass nurse" and other medical personnel in the following days (*see id.* at 16), suggesting that officers had appropriate passed along Urioste's requests for medical attention. Thus, the alleged circumstances surrounding the March 22 incident do not support a retaliation claim, and Urioste has not produced evidence showing otherwise.

In addition to the foregoing, Urioste also premises retaliation claims on punishment he received following an April 16 report of fishing by unnamed officers and following a June 14 report of fishing by Palomino. As to the former incident, Urioste once again does not deny the fishing allegation, and he does not allege that any named NMCD Defendants were responsible for that report. (*See id.* at 38-39); (*see also* Doc. 55-1 at 19) (noting infraction date). And Urioste's claim concerning the latter incident, like the March 22 fishing infraction, appears

intended to support a claim against *Maciel* for imposing the punishment, rather than against

Palomino for reporting the matter. (*See* Doc. 62 at 40-41) (claiming that UMT hearing and

punishment were "retaliation for complaints and requests filed by Plaintiff"). In neither case does

Urioste assert anything other than generalized conclusory allegations regarding retaliation, rather

than the "specific facts" required to support a § 1983 claim on that basis. *See Peterson*, 149 F.3d

at 1444. For this reason, any retaliation claim concerning these two incidents may not proceed.

### 4.  Remaining Allegations of Retaliatory Conduct

Urioste's remaining retaliation claims concern relatively minor conduct. In evaluating

these claims, the undersigned is mindful that the Constitution does not serve "as a micromanager

of daily prison activities, and a guarantee of prisoner preferences over those of prison officials."

*Handy v. Price*, 996 F.2d 1064, 1068 (10th Cir. 1993); *see also Sandin v. Conner*, 515 U.S. 472,

482 (1995) ("[F]ederal officials ought to afford appropriate deference and flexibility to [prison]

officials trying to manage a volatile environment."). Reviewing these allegations and the

evidence in the light most favorable to Urioste, the undersigned recommends that the Court grant

the NMCD Defendants summary judgment as to these claims.

Urioste asserts that he was denied scheduled legal calls by Perez and Trujillo on February

28, by Palomino on April 7, and by Palomino on April 11. (Doc. 62 at 36, 37). As the NMCD

Defendants argue, though, Urioste "implies more than alleges that this was some sort of

retaliatory measure." (Doc. 44 at 9). Again, aside from the previously mentioned conclusory

allegation of "extreme retaliation" (Doc. 62 at 35), Urioste describes no factual circumstances

concerning the denials of these calls, let alone enough factual circumstances to establish that any

requests for medical care constituted the "but-for" cause of these denials. To the extent that

Urioste's retaliation claim is premised on these events, they do not establish a retaliation claim and are not sufficient to defeat the NMCD Defendants' entitlement to summary judgment.

Urioste contends that he saw Perez and Trujillo "spray[] an unknown substance" on his food on April 22. (*Id.* at 39). He also contends that Perez and Trujillo hid his tray out of sight at some point on April 28, that he "noticed the taste of bleach" in his food afterward, and that he saw the same officers "tampering with the food" at another meal that day. (*Id.*). Urioste further alleges that Trujillo served him rotten milk on May 11. (*Id.* at 40). But Urioste does not allege that these purported acts followed any request for medical assistance. (*See id.*). Moreover, allegations of unspecified "tampering," that his food tasted different on one occasion, and that an "unknown substance" was added to his food at another time are far too generalized to establish that any adverse conduct occurred. *Cf. Carroll v. Newton*, No. 00-cv-00099 MV/KBM, 2002 WL 35650178, at *4 (D.N.M. Feb. 19, 2002), *PFRD adopted*, (Doc. 68) (D.N.M. Mar. 25, 2002), *aff'd*, 44 F. App'x 455 (10th Cir. 2002) (unpublished). These allegations do not support a claim of retaliation.

　　　*5. Conclusion*

For the foregoing reasons, the undersigned RECOMMENDS that the Court DENY the NMCD Defendants' request for summary judgment as to Urioste's retaliation claims against Palomino for spraying him with mace on April 20 and calling him a "rat" on June 14. As to Urioste's remaining retaliation claims, the undersigned RECOMMENDS that the Court GRANT summary judgment in favor of the NMCD Defendants on the basis of qualified immunity.

## H.  DUE PROCESS

In addition to his claims of deliberate indifference and retaliation against the NMCD Defendants, Urioste has also asserted due process claims concerning discipline that he has

received. (*See, e.g.*, Doc. 36-38) (addressing punishment relating to discovery of contraband); (*id.* at 37-39) (discussing certain UMT hearings and discipline imposed). However, these claims appear to be directed at Maciel in his individual and official capacity and not at the current NMCD Defendants, given that it was Maciel who allegedly imposed the discipline at issue. (*See id.* at 36-39) (discussing punishment imposed by Maciel at hearings on March 24, March 31, April 14, and April 22); (*see also id.* at 3) (noting capacity of Defendants). Because Maciel appears not to have received service of process as of this writing, the undersigned does not address these claims at this time.

## I.  OFFICIAL CAPACITY CLAIMS

The NMCD Defendants express some confusion as to whether Urioste's claims are raised against them in their individual or official capacities. (*See* Doc. 44 at 34). This confusion is understandable; Urioste himself only recently sought to clarify that he is suing Defendants in both their official and individual capacities. (*See* Doc. 52) (motion to amend); (*see also* Doc. 62 at 3) (stating for first time that "[e]ach defendant is sued individually and in his or her official capacity"). Perhaps as a result, the NMCD Defendants raise the same arguments for summary judgment regardless of the capacity in which they are targeted by Urioste's claims; they have not asserted any defenses specific to claims asserted against them in their official capacity.

"An official capacity suit is only another way of pleading an action against an entity of which an officer is an agent." *See Johnson v. Bd. of Cnty. Comm'rs*, 85 F.3d 489, 493 (10th Cir. 1996). Since no official-capacity claim may lie where there is no underlying constitutional violation, *see, e.g.*, *Martinez*, 563 F.3d at 1091-92 (citation omitted), the NMCD Defendants are entitled to summary judgment in their official capacity to the same extent as in their individual capacity. Thus, to the extent that the undersigned recommends that the Court grant summary

judgment to the NMCD Defendants in their individual capacity, the undersigned recommends

that the Court grant summary judgment to the same Defendants in their official capacity. In all

other respects, the undersigned recommends that summary judgment be denied.

## IV.  CONCLUSION

**IT IS, THEREFORE, RECOMMENDED** that the Court:

1)      STRIKE certain allegations in Urioste's Second Amended Complaint in a manner

consistent with these recommendations;

2)      GRANT Urioste permission to file his surreply (Doc. 63) *nunc pro tunc* to August

7, 2020;

3)      GRANT summary judgment to the NMCD Defendants as to Urioste's Eighth

Amendment deliberate indifference claims;

4)      DENY summary judgment to Defendant Palomino as to certain retaliation claims

against him as specified herein; and

5)      GRANT summary judgment to the NMCD Defendants as to Urioste's remaining

retaliation claims.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN (14) DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension of time must be filed in writing no later than seven (7) days from the date of this filing. A party must file any objections with the Clerk of the District Court within the fourteen (14) day period, together with any period for which an order is entered granting an extension of time, if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**


_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**