## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSHUA URIOSTE,

      Plaintiff,

      vs.                          No. 1:16-CV-00755-JCH-KRS

CORIZON AND CENTURION
HEALTH CARE PROVIDERS, et al.,

      Defendants.

### **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter is before the undersigned on the Order to Show Cause entered on August 3, 2021 (Doc. 89), and on the Second *Martinez* Report filed by Defendants German Franco, Clarence Olivas, Michelle Boyer, Roger Trujillo, Kyle Perez, Augustine Palomino, FNU Cordova,[1] and Gary Maciel (collectively the "NMCD Defendants") on November 22, 2021 (Doc. 104). Plaintiff Joshua Urioste, a prisoner presently incarcerated at Southern New Mexico Correctional Facility in Las Cruces, New Mexico, timely filed a brief in response to the NMCD Defendant's Second *Martinez* Report on January 26, 2022. (*See* Doc. 107).

Having considered the parties' submissions to date along with the available record, the undersigned RECOMMENDS, as described further herein, that the Court: (1) GRANT summary judgment to Defendant Maciel as to Urioste's claims against him in his individual capacity; (2) GRANT summary judgment to Defendant Cordova as to Urioste's claims against him in his

---

[1] As the undersigned addresses in an order filed contemporaneously with these findings and recommendations, it is not entirely clear that any attorney has properly entered an appearance in this proceeding on behalf of Cordova in his individual capacity, which in turn raises questions as to whether Cordova has been properly served in this action. Because an officer of the Court has provided that he represents Cordova's interests in this action (*see* Doc. 99), has purported to accept service on Cordova's behalf (*see* Doc. 87), and has argued on Cordova's behalf in the instant *Martinez* Report, the undersigned has proposed findings and recommended a disposition as to all claims against Cordova on those understandings. If the record ultimately reveals that service upon Cordova has not been properly effected, the undersigned proposes that the Court adopt its recommendations as to the claims against Cordova *solely* as they pertain to Urioste's official-capacity claims against him.

individual capacity; (3) GRANT summary judgment to the NMCD Defendants as to all remaining official-capacity claims against them in this action; and (4) DISMISS WITHOUT PREJUDICE all claims against Defendants Jose Martinez, M.D., and Ben Martinez, P.A.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the facts described herein are not in genuine dispute for present purposes. Because Urioste's pleading allegations are limited to activity in 2016, all dates cited herein are in 2016 unless otherwise stated. (*See, e.g.*, Doc. 44-2 at 113-20).[2]

During all relevant periods, Urioste was in the custody of the New Mexico Corrections Department ("NMCD") and was housed at the North Facility at the Penitentiary of New Mexico ("PNM"). At all relevant times, Franco served as the warden at PNM, Maciel worked as the unit manager for Urioste's unit in the North Facility, and Cordova was a correctional officer assigned to PNM. (*See* Doc. 62 at 2-3).

### A. MEDICAL ALLEGATIONS

On February 14, Urioste began coughing up blood, fainting, and injuring himself. (Doc. 62 at 4). Three days later, after experiencing cramping and coughing up blood, Urioste was seen at the PNM medical clinic. (*Id.*). Progress notes state that Urioste complained of diarrhea and other problems but "ha[d] not told anyone [of his symptoms] until now." (Doc. 44-3 at 5). Urioste was given medication and briefly placed on medical observation. (*See id.*); (Doc. 62 at 5). On February 18, after experiencing additional symptoms during a recreational period, Urioste was carried to his unit and seen by PNM medical providers. (*See* Doc. 62 at 5-6). He remained

---

[2] Given that the NMCD Defendants' evidentiary submission in support of its Second *Martinez* Report is almost entirely duplicative of its submission in support of the first *Martinez* Report (*see* Doc. 44), the undersigned largely cites to the latter except where doing otherwise is necessary or would provide more clarity. Because the parties use different page-numbering schemes and sometimes incorrectly paginate filings, all citations to the parties' filings and exhibits are to the corresponding ECF page numbers unless otherwise specified.

on medical observation until February 20, when he was returned to his unit after stating that he felt better. (*See* Doc. 44-3 at 5-7); (Doc. 62 at 10).

Urioste sought medical attention after experiencing more pain and nausea on February 21. (Doc. 62 at 10). On February 22, PNM medical staff examined Urioste and sent him to the emergency department at St. Vincent's Hospital in Santa Fe. (*See* Doc. 44-3 at 8); (Doc. 62 at 10-11). Urioste was ultimately diagnosed with cholelithiasis (gallstones) and gastritis, and he was told that he would "eventually" need surgery to remove his gallbladder. (Doc. 44-3 at 8-9); (Doc. 62 at 11). Urioste was prescribed various medications and a bland low-fat diet, and he was discharged and returned to a medical cell at PNM on the evening of February 23 before being sent back to his unit the next afternoon. (*See* Doc. 44-3 at 8-9); (Doc. 62 at 12).

Urioste continued to seek additional treatment that he alleges was not properly afforded to him by prison medical staff. (*See, e.g.*, Doc. 62 at 13-14). However, medical records reflect that PNM personnel worked over the next few months to get Urioste scheduled for gallbladder removal surgery. An April 4 note from Dr. Jose Martinez states that Urioste's cholelithiasis was a "known" issue that was pending surgery but that a follow-up ultrasound was to be scheduled first. (Doc. 44-3 at 18). On May 16, Dr. Martinez notified Urioste that an offsite surgical consult was approved and pending. (*See id.* at 19). On June 6, Dr. Martinez advised Urioste that he was scheduled for a gastrointestinal surgical consult and that laparoscopic surgery would be arranged after that consult. (*See id.* at 22). On June 27, Urioste was told that a gastrointestinal visit would occur "soon (this week)" and that his gallbladder removal surgery would be scheduled thereafter. (*See id.* at 26); (*see also* Doc. 62 at 23). On July 12, a nurse again told Urioste that he was scheduled for surgery. (*See* Doc. 62 at 25).

Urioste was admitted directly to the internal medicine department at St. Vincent's Hospital the next day. (*See* Doc. 44-3 at 30); (*see also* Doc. 44-2 at 115) (location history). His gallbladder was surgically removed the day after that, July 14. (*See* Doc. 62 at 25-26). The Second Amended Complaint asserts no additional claims concerning improper medical treatment (or lack thereof) after July.

### B.   ALLEGATIONS CONCERNING MEDICAL GRIEVANCE SUBMITTED TO MACIEL

Urioste alleges, and the NMCD Defendants appear to concede, that he submitted an informal grievance "directly" to Maciel on February 22 concerning his treatment by prison medical staff on February 17-18, when he was first seen for his condition. (*See, e.g.*, Doc. 62 at 43); (Doc. 104 at 13).[3] Urioste filled out and submitted to Maciel a second informal grievance against "Medical" on February 29, alleging that the doctor at PNM had denied him medication and stating that he needed to have his gallbladder removed. (*See* Doc. 44-2 at 20). Records indicate, and Urioste does not appear to dispute, that Maciel did not receive the February 29 informal grievance until March 2. (*See id.*). Maciel requested more information from PNM medical staff as to both informal grievances on that day, and again on April 13, but he received no response. (*See id.* at 18, 20); (*see also* Doc. 44-1 at 2). On May 3, Maciel noted that he had not yet received any response from PNM medical staff concerning Urioste's February 22 and February 29 informal grievances, and he recommended that Urioste pursue a formal grievance. (Doc. 44-2 at 18, 20). Although Urioste did so, the matter was marked resolved as of June 22,

---

[3] As noted in the May 6, 2021 PFRD, the undersigned assumes the truth of Urioste's allegation regarding the date of his submission of the February 22 informal grievance, even though there are indications that the document was submitted later than February 22. (*See* Doc. 73 at 4 & n.3); (*see also* Doc. 104-1 at 2) (Maciel's sworn statement that he received complaint on March 2). As before, Urioste's allegations concerning the contents of that grievance are disregarded to the extent that they are inconsistent with his own narrative in that document and the time frame of his hospitalization. (*See* Doc. 73 at 4 & n.3) (citing *Vette v. Sanders*, 989 F.3d 1154, 1164-65 (10th Cir. 2021)).

and the Director of Adult Prisons eventually affirmed that resolution despite an appeal by Urioste. (*See, e.g.*, Doc. 55 at 61-63).

### C.   ALLEGATIONS CONCERNING DISCIPLINARY PROCEEDINGS AND RETALIATION

Urioste alleges wrongdoing by Maciel concerning certain disciplinary actions taken against him in March through June. Although the record suggests that the measures described here were intended as discipline for prison infractions, Urioste appears to allege that each measure was in fact intended as retaliation for his efforts to seek medical attention. (*See* Doc. 62 at 35) (describing, *e.g.*, revocations of good-time and recreational privileges as "extreme retaliation . . . for vigorously pursu[]ing medical attention").

On March 15, prison officials (not including Maciel) conducted a shakedown of Urioste's cell and found an "altered razor" and a length of wire, which were deemed to be contraband. (*See* Doc. 44-2 at 106); (*see also* Doc. 62 at 36) (describing cell shakedown). A hearing was conducted on March 24, and on March 28, Franco approved the hearing officer's recommendation that Urioste's phone and recreational privileges be revoked for thirty days. (*See* Doc. 44-2 at 103). Urioste does not appear to allege that Maciel was involved in this decision in any way, and the relevant documentation does not suggest his involvement. (*See id.*) (disciplinary decision record).

Around the same time, Urioste was repeatedly brought before PNM's Unit Management Team disciplinary committee ("UMT") for multiple infractions. After officers allegedly caught Urioste "fishing" with other prisoners on March 22 and March 24, Urioste was brought before the UMT for hearings, leading to Maciel revoking approximately two days' worth of recreational time for each infraction on March 31. (*See* Doc. 55-1 at 19, 21) (describing incidents and specific time period for revocation); (Doc. 62 at 36-37) (allegations regarding revocation).

On April 1, a classification officer recommended that thirty days of Urioste's good-time credit be revoked in light of the aforementioned contraband and fishing offenses. (*See* Doc. 55-1 at 18). Maciel approved of this decision in his capacity as supervisor, and the decision was further approved by the warden or deputy warden on the same day. (*See id.*).

On April 14, citing the March contraband infraction, Maciel allegedly approved an order regressing Urioste to "Step 2" under the NMCD Predatory Behavior Management Program ("PBMP") Conditions of Confinement policy. (*See id.* at 17)[4]; (*see also* Doc. 62 at 37-38) (describing Maciel involvement); (Doc. 44-4 at 198) (discussing step regression). After Urioste was caught fishing yet again two days later, he was again brought before the UMT, and Maciel caused him to be regressed to "Step 1" in the PBMP on April 22. (*See* Doc. 55-1 at 19); (*see also* Doc. 62 at 38-39). Urioste progressed to Step 2 again in May. (*See* Doc. 55-1 at 20).

### D.  ALLEGATIONS REGARDING UNSANITARY CELLS

Urioste alleges that he was twice housed in unsanitary cells. On June 27, Urioste was moved to cell 3BW111, which Urioste says featured "no plumbing and feces in the toilet." (Doc. 62 at 41); (*see also* Doc. 44-2 at 115) (noting placement in cell "N3B W111 S" on June 27). Urioste alleges that Maciel was responsible for his move to this cell as retaliation for his use of the grievance process and his requests for medical attention. (*See* Doc. 62 at 41). On July 13, Urioste was transferred from this cell to St. Vincent's Hospital for his gallbladder surgery. (*See* Doc. 44-2 at 115). When Urioste returned to PNM on July 18, Cordova "placed" him in cell 3BW109. (*See id.*); (*see also* Doc. 62 at 27). Urioste alleges that the latter cell was "filthy" with

---

[4] There is some ambiguity in the record as to whether Urioste actually was "regressed" to Step 2 at this time (*see* Doc. 55-1 at 16) (showing that Urioste was already on Step 2 prior to the April 14 step placement). Nevertheless, the undersigned resolves this factual dispute in Urioste's favor for present purposes.

"feces and blood on the walls, feces smeared all over the toilet, and mase all over the cell." (*See* Doc. 62 at 27).

### E.  ALLEGATIONS THAT CORDOVA IGNORED REQUESTS FOR MEDICAL ATTENTION

Aside from the July 18 cell placement issue, Urioste's allegations against Cordova center on the first two weeks of July, after Ben Martinez told Urioste on June 27 that he was scheduled for gallbladder surgery (*see* Doc. 62 at 23) but before the July 14 surgery itself (*see id.* at 26). Urioste alleges that on July 4, Cordova made him stand in a shower closet for over ninety minutes, even though his shower only lasted for five minutes. (*See id.* a 42). He alleges that he asked to be seen by medical personnel during this time, and in response Cordova said, "Keep bugging [me] and I'll leave you in there all day." (*See id.*). Although Urioste does not state whether medical personnel saw him on this date (*cf. id.*), he alleges elsewhere that medical personnel visited with him on July 8, four days after this incident, at which time a nurse told him he was scheduled to see the provider (*see id.* at 23).

Urioste alleges that a similar event occurred on July 11: after asking to be seen earlier in the day by medical personnel, Cordova left him in the shower closet for over 90 minutes. (*See id.* at 42). On this occasion, Cordova allegedly lobbed an expletive at Urioste and said, "I hope you die so I don't have to deal with this s—t." (*See id.* at 42-43). Although Urioste alleges that he did not receive medical attention at that time (*see id.* at 43), he concedes that he was seen by medical personnel the following day and that he was transferred to St. Vincent's Hospital for his surgery the day after that (*see id.* at 25-26).

## II. RELEVANT PROCEDURAL BACKGROUND

The undersigned assumes the reader's familiarity with the procedural background set forth in the May 6, 2021 PFRD. (*See* Doc. 73 at 8-9). For easier reference, the undersigned briefly summarizes that background before addressing further developments since that time.

Urioste initiated this lawsuit on June 29, 2016, through the filing of a complaint focusing on alleged Eighth Amendment violations. (Doc. 1). Urioste's amended pleadings, including the operative Second Amended Complaint filed on April 10, 2020 (*see* Doc. 62), have added additional claims and Defendants. Pursuant to 28 U.S.C. § 1915A and the Federal Rules of Civil Procedure, the Court narrowed the allegations presented in the pleadings and dismissed certain claims and parties before resolving the merits arguments raised in the first *Martinez* Report. (*See, e.g.*, Doc. 22) (dismissing initial complaint); (Doc. 26) (dismissing some claims and parties upon § 1915A review of First Amended Complaint); (Doc. 73 at 12-14) (recommending the striking of certain allegations in Second Amended Complaint); (Doc. 84) (adopting recommendations).

On May 5, 2020, the remaining NMCD Defendants—except for Maciel and Cordova, who had not yet been served—filed the first *Martinez* Report, seeking summary judgment as to the claims asserted against them in their individual and official capacities. (Doc. 44). On May 6, 2021, the undersigned recommended that the Court deny summary judgment to Palomino as to certain retaliation claims against him, that the Court otherwise grant summary judgment to the aforementioned Defendants as to Urioste's retaliation claims, and that the Court grant summary judgment to those Defendants as to Urioste's Eighth Amendment deliberate indifference claims against them. (*See* Doc. 73 at 47). The undersigned's recommendations pertained to the claims asserted against these Defendants in both their individual and official capacities. (*See id.* at 46-47). The Court subsequently adopted these recommendations. (Doc. 84).

As these matters were being addressed, the undersigned also worked with the parties to resolve the longstanding problem of service, or lack thereof, upon Maciel and Cordova. (*See, e.g.*, Doc. 66) (order regarding Maciel); (Doc. 69) (order regarding Cordova); (Doc. 85) (clerk's minutes for June 29, 2021 status conference). In a status report dated August 2, 2021, counsel for the NMCD Defendants agreed to accept service on behalf of Maciel and Cordova. (*See* Doc. 87 at 1-2). On September 9, 2021, the NMCD Defendants—including Maciel and Cordova—filed an answer to Urioste's Second Amended Complaint addressing all claims remaining against them. (*See* Doc. 91).

That left Urioste's claims against the Medical Defendants, Jose Martinez, M.D., and Ben Martinez, P.A. After those Defendants failed to return waiver-of-service forms, the Court directed service upon them care of one corporate entity in early 2020 (Doc. 32) and care of a second corporate entity in mid-2021 (Doc. 67). Both entities stated that they lacked authorization to accept service for the Medical Defendants. (*See* Doc. 53); (Doc. 74).[5] Following a status conference with the parties, the Court directed counsel for the NMCD Defendants to provide any information in their clients' possession that may assist with locating the Medical Defendants for service purposes. (*See* Doc. 86). In response, NMCD Defendants' counsel stated that their clients possessed no information regarding either of the Medical Defendants. (*See* Doc. 87 at 2-3).

In light of the foregoing, the Court entered an order directing Urioste to show cause on or before September 7, 2021, as to why the Medical Defendants should not be dismissed from this action. (Doc. 89). In a filing dated September 8, 2021, Urioste requested an extension of this deadline. (Doc. 93). The Court then directed that Urioste respond to the Order to Show Cause on

---

[5] Both entities have denied that they currently employ Ben Martinez or that they have ever employed Jose Martinez. (*See* Doc. 53); (Doc. 74).

or before October 7, 2021. (Doc. 95). Urioste did not file any further response to the Court's

Order to Show Cause, either before or after the October 7, 2021 deadline.

### III.  ANALYSIS

#### A.  MEDICAL DEFENDANTS

As the above procedural background makes clear, service of process has not yet been

effected upon Medical Defendants Jose Martinez, M.D., and Ben Martinez, P.A. For this reason,

and for the reasons set forth below, the undersigned recommends that Urioste's claims against

the Medical Defendants be dismissed without prejudice.

Federal Rule of Civil Procedure 4(m) provides in relevant part as follows:

> If a defendant is not served within 90 days after the complaint is filed, the court--
> on motion or on its own after notice to the plaintiff--must dismiss the action without
> prejudice against that defendant or order that service be made within a specified
> time. But if the plaintiff shows good cause for the failure, the court must extend the
> time for service for an appropriate period.

FED. R. CIV. P. 4(m).

Needless to say, more than 90 days have passed since Urioste filed this action against the

Medical Defendants on June 29, 2016. Although the case was stalled for some time as a result of

the § 1915A screening process, well over 90 days have also passed since the Court first directed

that waiver-of-service forms be sent to the Medical Defendants. (*See* Doc. 26). Since that time,

the Court has gone to significant lengths to further assist Urioste in effecting service upon the

Medical Defendants, including: (1) directing that service be attempted on the Medical

Defendants care of Corizon Health Inc. and other entities (*see* Doc. 32) once all of the other

Defendants had entered the case (*see* Doc. 29); (2) when that failed, ordering that service be

attempted on the Medical Defendants care of Centurion Correctional Healthcare of New Mexico

in light of additional information provided by Urioste (*see* Doc. 67); and (3) instructing counsel

for the NMCD Defendants to provide any information in their possession regarding the

whereabouts of the Medical Defendants (*see* Doc. 85); (Doc. 86). Despite these efforts, there remains no indication in the record that the Medical Defendants have been properly served.

Rule 4 provides that an extension of the service deadline is mandated if a plaintiff shows good cause for the failure to timely effect service. *See, e.g.*, *Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir. 1995). Here, however, Urioste has not responded to the Court's Order to Show Cause (Doc. 89), despite receiving an extension of the deadline to do so (*see* Doc. 95). Nor has Urioste provided good cause at any earlier point in the litigation for his failure to provide valid, up-to-date contact information for the Medical Defendants so that the Court might effectuate service upon them pursuant to 28 U.S.C. § 1915(d). On these facts, and particularly given Urioste's failure to respond to the Court's Order to Show Cause, Plaintiff has not shown good cause for any further extension of the service deadline.

Even if a plaintiff fails to show good cause for a failure to serve process, the Court must still consider whether a permissive extension of time is proper before dismissing the claims against an unserved defendant with prejudice. *See, e.g.*, *Espinoza*, 52 F.3d at 841-42. In doing so, the Court must consider factors including whether the applicable statute of limitations would bar a refiled action, the possibility that confusion or delay arises from a prisoner's *in forma pauperis* status, whether the unserved defendant appears to be evading service, and other applicable policy considerations. *See id.*; *see also* FED. R. CIV. P. 4(m) advisory committee's note (1993 amend.) (noting evasion as possible grounds for extension). There are no indications in the record that either of the Medical Defendants is evading service, and Urioste's capable and intelligent representation of himself in this action leads the undersigned to conclude that the lack of service does not arise from confusion or delay resulting from his *in forma pauperis* status. Nor does the record suggest that other policy considerations weigh in favor of a permissive extension.

The statute of limitations warrants more detailed consideration. Urioste's claims against the Medical Defendants pursuant to 42 U.S.C. § 1983 have been pending well beyond the three-year limitations period governing such claims in New Mexico. *See Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) (citation omitted). Although the undersigned cannot definitively determine on this record whether Urioste might be entitled to tolling of the limitations period were he to refile in the future, it may be safely assumed for now that the statute of limitations could bar any subsequently filed action against the Medical Defendants. But that factor alone cannot warrant a permissive extension. *See May v. Okla. Dep't of Corrs.*, No. 99-6267, 215 F.3d 1337, at *2 (10th Cir. May 17, 2000) (unpublished table decision). Given that Urioste has been unable to provide valid, current contact information for the Medical Defendants to the Court in the five-plus years that this action has been pending, and given that Urioste "has wholly failed to respond to the Court's Order to Show Cause, a permissive extension of time is not warranted." *See Harper v. Woodward Cnty. Bd. of Cnty. Comm'rs*, No. CIV-11-996-HE, 2016 WL 4487716, at *2 (W.D. Okla. July 13, 2016) (citing *May*, 215 F.3d 1337, at *2) (recommending dismissal under similar circumstances); *cf. Crosley v. United States*, No. 1:20-cv-00044 WJ/JFR, 2020 WL 2467437, at *2 (D.N.M. May 13, 2020) (citing *May*, 215 F.3d 1337, at *2) (affording brief permissive extension of service deadline where statute of limitations would bar claims and action had been pending for only 120 days).

Urioste failed to timely effect service on the Medical Defendants, he has not shown good cause for this failure, and there are no factors evident on the record that counsel in favor of a permissive extension of the service deadline. The undersigned therefore recommends that Urioste's claims against the Medical Defendants be dismissed without prejudice for failure to effect timely service of process upon these Defendants.

### B.   SECOND *MARTINEZ* REPORT

In their Second *Martinez* Report, the NMCD Defendants seek summary judgment as to all claims against Maciel and Cordova, as well as all remaining claims against them in their official capacities. (*See* Doc. 104). Urioste's response in opposition focuses entirely on his claims against Maciel, primarily those concerning Maciel's alleged mishandling of certain informal grievances and his imposition of punishment for disciplinary infractions. (*See* Doc. 107). Having reviewed these filings and the record in its entirety, the undersigned recommends that the Court grant summary judgment in favor of these Defendants as set forth below.

#### 1.   *Legal Standards*

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). In ruling on a summary judgment motion, the Court may neither make credibility determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). A *Martinez* report is also treated as an affidavit, and this report can be used in determining whether to grant summary judgment if it is "supported by affidavits or other materials provided under oath." *Id.* at 1110,

1111 (citations omitted). A court cannot resolve material factual disputes by accepting a *Martinez* report's findings when the plaintiff has presented conflicting evidence. *Id.* at 1111. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

As with all pleadings filed by pro se individuals, the Court must liberally construe the allegations contained in the plaintiff's pleadings. *Northington v. Jackson*, 973 F.2d 1518, 1520-21 (10th Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). However, the Court must apply the same legal standards applicable to pleadings drafted by counsel. *Id.*

Additional steps are taken when a summary judgment motion raises a defense of qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* The court may consider either of these prongs before the other "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 772 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

The "clearly established" inquiry exists in part to protect officers who were mistaken as to what the law required at the time of the alleged constitutional violation, but whose mistake of law was reasonable. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001). Because the doctrine is intended to protect "all but the plainly incompetent or those who knowingly violate the law," summary judgment on the basis of qualified immunity is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Id.* at 202 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Ordinarily, a right is considered to be clearly established only when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted). Additionally, "'[g]eneral statements of law' can clearly establish a right for qualified immunity if they apply 'with obvious clarity to the specific conduct in question.'" *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

At the summary judgment stage, a court generally must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will

review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

### 2.   *Maciel's Alleged Delays in Procuring Medical Care*

Urioste claims that Maciel acted with deliberate indifference in his handling of informal complaints concerning the care provided by PNM medical personnel. (*See, e.g.*, Doc. 62 at 43). He also contends that Maciel failed to adequately respond to his statements regarding his medical condition at UMT hearings. (*See id.*). For the following reasons, the undersigned concludes that Maciel is entitled to summary judgment as to these claims.

The Tenth Circuit recognizes two broad types of deliberate indifference claims: those in which a medical professional fails to properly treat a serious medical condition, and those where "prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Because Maciel is not a medical professional, the only type of claim presently at issue is the second, concerning whether he prevented Urioste from receiving treatment or denied him access to medical personnel. *See id.*

In the context of a prisoner's § 1983 claim, deliberate indifference

constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. To state a cognizable Eighth Amendment claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. The deliberate indifference test involves an objective and a subjective component. The objective component requires the plaintiff to allege the deprivation at issue was sufficiently serious. That is, the defendant's actions must result in the denial of the minimal civilized measure of life's necessities. The subjective component requires the prisoner to allege the official was deliberately indifferent to a serious medical need. A plaintiff sufficiently alleges a culpable mindset when the facts alleged show a prison official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

> from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Walker v. Mohiuddin*, 947 F.3d 1244, 1250 (10th Cir. 2020) (cleaned up).

Urioste's claims concern a *delay* in medical treatment rather than an outright *denial* of treatment. As such, he is required to show "that the delay resulted in substantial harm" in order to establish that an official's deliberate indifference was "sufficiently serious" in order to satisfy the objective component of the Eighth Amendment test. *See Sealock*, 218 F.3d at 1210 (citation omitted). The Tenth Circuit has recognized that the substantial harm requirement is satisfied by a showing of "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (quotation omitted) ("Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'").

As an initial matter, Urioste is unable to establish a genuine dispute of fact as to the objective component of a deliberate-indifference claim against Maciel. To be sure, Urioste attests in the Second Amended Complaint that he suffered substantial pain and other symptoms for several months while waiting for surgery (*see, e.g.*, Doc. 62 at 3), and the medical record does not appear to show otherwise. *See, e.g.*, *Al-Turki*, 762 F.3d at 1193-94 (holding that allegations of severe pain lasting for several *hours*, which allegedly could have been alleviated through earlier treatment, were sufficient to overcome summary judgment); *see also, e.g.*, *Kellum v. Mares*, 657 F. App'x 763, 771 (10th Cir. 2016) (unpublished) (holding that substantial "intermediate harm[s]," including "unnecessary pain," may satisfy objective element even if delay did not cause underlying condition). However, to prevail on an Eighth Amendment claim

against Maciel, Urioste must show not only an "objectively sufficiently serious" medical need, but also that it was a delay *on the part of Maciel himself*, in his "gatekeeper role," that caused him substantial harm. *See, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (noting that objective element of deliberate-indifference claims requires showing that "medical need was objectively sufficiently serious, and that defendant['s] delay in meeting that need caused her substantial harm").

Here, there is no evidence in the record that Maciel himself "delay[ed] or refuse[d] to fulfill [his gatekeeper role]" by failing to timely seek or obtain medical attention for Urioste. *See id.* (quoting *Sealock*, 218 F.3d at 1211). Although Urioste attests in a broad and conclusory fashion that he "spoke to Gary Maciel about his medical issues at each UMT disciplinary committee" (*see* Doc. 62 at 43), he does not provide information with sufficient particularity to establish that any delay in obtaining medical care followed from these conversations, particularly given that Urioste received regular medical attention for his symptoms (*see generally* Doc. 44-3 at 5-30) (documenting multiple examinations and communications from medical personnel concerning gallbladder and other issues throughout relevant period). Nor does Urioste appear to claim that he asked Maciel to obtain medical attention on his behalf at these hearings, or that Maciel refused any such request; rather, he alleges that he cited his medical issues as an excuse for his disciplinary problems during the hearings. (*See* Doc. 62 at 43) (alleging Urioste told Maciel at UMT hearings that his medical situation "was the reason he was having all these problems"). On the one occasion where evidence could support a conclusion that Urioste requested direct intervention from Maciel due to the alleged inadequacy of medical care—specifically, his complaints about not receiving nausea medicine or other adequate treatment in his February 29 informal grievance—the record shows that Urioste was seen by PNM medical

staff the morning after he submitted that document (*see* Doc. 44-3 at 11) (record of March 1 visit), before Maciel even received it (*see* Doc. 44-2 at 20) (grievance received on March 2). The record also shows that Maciel requested a response from medical staff on the same day that he received Urioste's complaint. (*See id.*). On these facts, there is no genuine dispute that Maciel delayed the meeting of Urioste's serious medical needs, much less that any such delay caused him substantial harm. *See Mata*, 427 F.3d 751.

Urioste also has not established any genuine dispute concerning the subjective component of any deliberate-indifference claim against Maciel regarding medical treatment. Urioste's conclusory allegation that he "spoke to Gary Maciel about his medical issues" at UMT hearings (Doc. 62 at 43), without any additional elaboration as to what he told Maciel about his medical issues on these occasions and when they occurred, cannot evidence that Maciel was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed or that Maciel drew such an inference.[6] *See, e.g.*, *Fitzgerald*, 403 F.3d at 1143 (quotation omitted) (holding that "conclusory allegations without supporting facts have no probative value" at summary judgment). Nor do the allegations asserted in Urioste's February 22 informal grievance create a genuine dispute of material fact on this question. Although Urioste's informal grievance did note that he had suffered from "severe cramps" and vomiting, he also explained in the narrative portion of the form that he had been seen by medical personnel, diagnosed with

---

[6] In his unsworn response brief, Urioste claims that he told Maciel "at U.M.T. disciplinary committees [*sic*] and other times" that "he was in extreme pain, could not eat, [and] was constantly vom[]iting." (Doc. 107 at 2). But "[i]n the absence of other evidence, an unsworn allegation does not . . . create a genuine factual dispute to defeat summary judgment." *See Simpson v. Jones*, 316 F. App'x 807, 811-12 (10th Cir. 2009) (unpublished) (citing *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)); *see also* D.N.M.LR-Civ. 7.3(b) ("Parties must submit evidence, in the form of declarations, affidavits, deposition excerpts, or other documents, in support of allegations of fact."). Even if those statements were to be considered as evidence, it is doubtful they would suffice to put Maciel on notice of a substantial risk of serious harm given that they were made in the context of defending against alleged disciplinary infractions rather than as part of a request for medical attention. (*See* Doc. 62 at 43) (describing statements at UMT hearings that "medical issues" were "the reason [Urioste] was having all these problems").

acute pancreatitis, and placed on an IV until he started feeling better. (*See* Doc. 44-2 at 18-19).

This is consistent with medical records showing that personnel monitored Urioste for several

days in PNM medical housing, provided him with medications and other treatments to address

his symptoms, and released him only after his symptoms had subsided. (*See* Doc. 44-3 at 5-7).

Indeed, Urioste emphasized in the February 22 informal grievance that his "main issue" was not

a lack of access to care or a need for additional medical attention, but frustration that medical

personnel had not treated him quickly enough and then laughed at him when they did see him.

(*See* Doc. 44-2 at 18-19). Those statements, which established that Urioste had already received

care but set forth a *retrospective* complaint about the bedside manner of PNM medical staff,

could not put Maciel on notice that a substantial risk of serious harm continued to exist *as of the*

*time that Urioste submitted the informal grievance*.

By contrast to the February 22 informal grievance, the February 29 informal grievance

did purport to address an ongoing medical issue. (*See* Doc. 44-2 at 20). Yet this grievance, too,

fails to provide any basis for finding that the subjective component of a deliberate indifference

claim has been satisfied. Urioste's allegation in that document that the doctor had "removed me

from my nausea meds" despite ongoing "severe nausea" (*see* Doc. 44-2 at 20), even if true,[7]

would not alone provide notice of a substantial risk of serious harm to a corrections officer with

no evident background of medical training. *See, e.g.*, *Miranda v. County of Lake*, 900 F.3d 335,

344 (7th Cir. 2018) (holding that jail officials do not act with deliberate indifference where they

"reasonably relied on the judgment of medical personnel" as to proper treatment); *Arocho v.*

*Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (unpublished) (citing, *e.g.*, *McRaven v.*

---

[7] This point is contested; the medical records indicate that both before and after February 29, Urioste remained on
the nausea medications that he had been prescribed less than a week earlier. (*See, e.g.*, Doc.44-3 at 9) (noting
prescriptions as of February 24); (*id.* at 11) (noting prescriptions and vital signs as of March 1).

*Sanders*, 577 F.3d 974, 981 (8th Cir. 2009)) (holding that warden's "reasonable reliance on the judgment of prison medical staff" serves to "*negate*[] rather than support liability" for deliberate indifference). Although Urioste also claimed in that grievance that he could not "get any type of treatment here" for his medical condition (*see* Doc. 44-2 at 20), vague and conclusory allegations of this sort will not do without additional supporting facts, which are lacking here.[8] *See, e.g.*, *Fitzgerald*, 403 F.3d at 1143 (citation omitted). Moreover, Urioste's broad claim that he was not "get[ting] any type of treatment here," on its own, would not give Maciel sufficient information to act upon since Urioste had recently put Maciel on notice that he was actually receiving treatment for his condition. (Doc. 44-2 at 19).

Urioste also points to various NMCD policies that he says were violated by Maciel in failing to respond to his complaints sooner. (*See, e.g.*, Doc. 62 at 43); (Doc. 107 at 2). However, because Urioste has not otherwise shown that the subjective element of his deliberate indifference claim against Maciel is satisfied, the mere existence of an administrative policy that may have been violated by his purported failure to more timely respond to Urioste's complaints will not suffice to establish that Maciel possessed facts allowing an inference of a risk of substantial harm or that Maciel actually drew such an inference. *Cf., e.g.*, *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) (holding that "mere existence of [a] policy" does not establish that a constitutional violation occurs when actions or inactions contravene that policy); *see also, e.g.*, *Hostetler v. Green*, 323 F. App'x 653, 657-58 (10th Cir. 2009) (unpublished) (quoting *Hovater*, 1 F.3d at 1068 n.4) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation.").

---

[8] If anything, the record suggests that the PNM medical personnel had been responsive to Urioste's medical needs during the relevant period. For example, a sick-call slip submitted by Urioste on February 29—the first since he had returned from the hospital five days earlier—was followed by a nursing visit the following day. (*See* Doc. 44-3 at 10-11).

With neither the objective component nor the subjective component established as to

Maciel, Urioste's Eighth Amendment deliberate-indifference claim against him must fail as it

pertains to the issue of medical treatment. This alone entitles Maciel to qualified immunity on

Urioste's claim. However, Maciel is also entitled to qualified immunity on this claim because

Urioste cannot show that any constitutional rights purportedly violated by Maciel were clearly

established. *See, e.g.*, *Saucier*, 533 U.S. at 205. Urioste has not pointed to a Supreme Court or

Tenth Circuit decision holding that an Eighth Amendment violation occurs under the clear

context of his specific factual assertions. *See, e.g.*, *Morris*, 672 F.3d at 1196 (quotation omitted).

Nor has Urioste shown that general Eighth Amendment principles apply with "obvious clarity"

to prohibit the specific conduct in question. *See, e.g.*, *Halley*, 902 F.3d at 1149 (quotation

omitted). No such argument appears in his response brief, and the undersigned can discern

nothing in the record to warrant such a conclusion. Thus, Maciel is entitled to qualified immunity

under either prong of the analysis.

For the foregoing reasons, the undersigned recommends that the Court grant summary

judgment in favor of Maciel as to this claim.

### 3.   *Revocation of Good-Time Credits and Recreational Privileges*

Urioste claims that Maciel wrongfully imposed discipline against him for prison

infractions. In particular, Urioste challenges Maciel's revocation of good-time credit due to

multiple disciplinary convictions in March (*see* Doc. 62 at 36); (Doc. 55-1 at 18), as well as

Maciel's revocation of recreational time over the course of three and a half days due to two of

these disciplinary convictions (*see* Doc. 62 at 36-37); (Doc. 55-1 at 21) (specifying period of

revocation). Maciel appears to contend that these punishments were imposed in violation of his

due process protections because Maciel did not permit him to present evidence to defend against

these claims or to seek higher-level review of the disciplinary actions. (*See* Doc. 36-37) (complaining of good-time and recreation privilege revocations by Maciel "without allowing [Urioste] the opportunity to present evidence" disputing underlying allegations or to "appeal"). Urioste also appears to claim that these actions amounted to "extreme retaliation" for his efforts to "vigorously pursue[] medical attention." (*Id.* at 35).

The undersigned has previously discussed the problems arising when a prisoner brings a § 1983 claim concerning prison discipline that may "imply the invalidity of the deprivation of good-time credits." (*See* Doc. 73 at 41-42) (discussing retaliation claims). In an unpublished but persuasive decision addressing a § 1983 due process claim for an allegedly improper deprivation of good-time credit, the Tenth Circuit summarized the situation as follows:

> [T]he Supreme Court has made clear that under its precedent, including *Heck* [*v. Humphrey*, 512 U.S. 477 (1994)], a writ of habeas corpus is the sole federal remedy in cases where a state prisoner seeks any relief, damages or otherwise, that would "necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005). [An inmate's] success in a § 1983 action for damages based on the deprivation of good-time and earned-time credits would require a federal court to determine that prison officials wrongly deprived him of those credits and held [him] longer than they should have. That would necessarily demonstrate that the duration of [his] confinement was invalid, even if his claim is viewed purely as a due process challenge to [the Corrections Department's] allegedly wrongful procedure for computing credits. See *Edwards v. Balisok*, 520 U.S. 641, 646 (1997) (applying *Heck* to prisoner's § 1983 suit that, if successful on procedural challenge, would imply the invalidity of the deprivation of good-time credits).

*Kilman v. Williams*, 831 F. App'x 396, 398 (10th Cir. 2020) (unpublished).

In short, if a prisoner's § 1983 due process claim could invalidate a deprivation of good-time credits, the general rule is that the § 1983 claim is barred and that an action for habeas

corpus is "the sole federal remedy" available to the prisoner.[9] *See id.* The same is true with respect to any § 1983 retaliation claim that could invalidate a deprivation of good-time credits:

> Plaintiff's claims that the disciplinary reports against him were false and retaliatory . . . are claims that necessarily implicate the validity of the disciplinary charges and the sanctions imposed, including the loss of good-time credits. *Heck* and *Edwards* make clear that Plaintiff does not have a cognizable § 1983 claim under these circumstances unless he can show that the disciplinary convictions have been invalidated.

*See, e.g.*, *Brown v. Cline*, 319 F. App'x 704, 705-06 (10th Cir. 2009) (unpublished) (citing, *e.g.*, *Edwards*, 520 U.S. at 648).

Here, Maciel claims he was denied due process as to his administrative convictions for fishing with other prisoners on two occasions and for possession of contraband on March 15, which in turn resulted in Maciel's revocation of his good-time credits (and, with respect to the fishing violations, Maciel's temporary revocation of his recreation privileges). (*See* Doc. 55-1 at 18) (reciting infractions justifying good-time revocation); (*id.* at 21) (noting revocation of recreational time for fishing infractions). He also appears to contend that these convictions and the resulting revocations were false and retaliatory in response to his efforts to obtain medical care. (*See* Doc. 62 at 35). These § 1983 challenges to his administrative convictions, if successful, "would necessarily demonstrate that the duration of [his] confinement was invalid" because they would also imply the invalidity of the associated revocation of good-time credits. *See Kilman*, 831 F. App'x at 398 (due process); *see also Brown*, 319 F. App'x at 705-06 (retaliation). Accordingly, his § 1983 challenge to these convictions is barred by *Heck*, and Maciel is entitled to judgment as a matter of law on this claim.

---

[9] The *Heck* bar "does not apply when a plaintiff has no available habeas remedy." *See, e.g.*, *Kilman*, 831 F. App'x at 398 (citing *Cohen v. Longshore*, 621 F. 3d 1311, 1317 (10th Cir. 2010)). But as the Tenth Circuit observed in *Kilman*, this exception may only be invoked where the plaintiff shows "that the lack of a habeas remedy is through no lack of diligence on his part." *See id.* (citing *Cohen*, 621 F.3d at 1317). Here, Urioste has made no such showing.

Even if *Heck* did not bar Urioste's due process challenge, his claim would not be viable insofar as it challenges the revocation of his recreational privileges.[10] A procedural due process claim is examined "in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the [defendants]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989). Sanctions commonly found in the carceral context "affect a liberty interest only when they restrain freedom significantly and atypically 'in relation to ordinary incidents of prison life.'" *Barela v. Martin*, 830 F. App'x 252, 254 (10th Cir. 2020) (unpublished) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

Here, Urioste has not demonstrated that his clearly established constitutional rights were violated by the revocation of recreational privileges. He has not shown that any relevant general statements of law apply with obvious clarity to this particular deprivation, and he cites no controlling precedent that is directly on point to the specific context of his case that also supports the viability of his claim. Conversely, in multiple unpublished but persuasive opinions, the Tenth Circuit has recognized that temporary losses of recreation privileges "are common sanctions in prison, so they couldn't possibly trigger a liberty interest." *Id.* (citations omitted); *see also Grady v. Garcia*, 506 F. App'x 812, 814-15 (10th Cir. 2013) (unpublished) (affirming summary judgment against inmate as to due process claim for loss of recreation privileges); *Marshall v.*

---

[10] The NMCD Defendants aver that this particular deprivation "was not implemented pursuant to the Inmate Discipline policy, but rather the PBMP, which concerns behavior management rather than discipline." (Doc. 104 at 23). For present purposes, the undersigned agrees with Urioste (*see* Doc. 107 at 9) that the distinction between discipline and "behavior management" is immaterial as it relates to this deprivation. The record is clear that Urioste's recreational privileges were temporarily revoked because he "was caught fishing" on two occasions. (*See* Doc. 55-1 at 21). This fact is sufficient to establish that the revocation was a disciplinary measure subject to the *Sandin* analysis, regardless of the policy used to justify the deprivation. *See, e.g.*, *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1341 (10th Cir. 2007) (quotation omitted) ("[I]t is 'not the language of regulations regarding [prison] conditions *but the nature of those conditions themselves* in relation to the ordinary incidents of prison life' that control due process claims.").

*Morton*, 421 F. App'x 832, 838 (10th Cir. 2011) (unpublished) ("[R]estrictions on an inmate's . . . recreation privileges are not different in such degree and duration as compared with the ordinary incidents of prison life to constitute protected liberty interests under the Due Process Clause."); *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006) (unpublished) (holding that recreational restrictions on inmates in administrative detention "do not impose an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life,' as contemplated by *Sandin* or [Tenth Circuit] precedent"). Because Urioste's loss of recreational time does not implicate a liberty interest, it cannot form the basis of a successful due process claim, and Maciel is entitled to qualified immunity insofar as that claim concerns such a deprivation.

Urioste's retaliation claims concerning his disciplinary revocations fare no better. The record establishes that Urioste's administrative convictions in March were supported by at least some evidence. (*See, e.g.*, Doc. 44-2 at 103, 106, 108) (describing evidence supporting Urioste's contraband conviction); (*id.* at 109) (picture of same); (*see also* Doc. 62 at 36-37) (noting statements of officers supporting fishing convictions). In the Tenth Circuit, "[a] prisoner cannot maintain a retaliation claim when he is convicted of the actual behavioral violation underlying the alleged retaliatory false disciplinary report and there is evidence to sustain the conviction." *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018) (quoting *O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011) (per curiam)). Because Urioste concedes that he was convicted of the underlying disciplinary infractions, and because the record establishes that at least some evidence supported those convictions, his retaliation claims concerning the resulting punishments are not viable.

More broadly, Urioste has simply failed to submit *any* evidence establishing a genuine dispute of material fact as to whether the punishment imposed by Maciel amounted to retaliation. To succeed on his retaliation claim, Urioste must show (1) that he was engaged in constitutionally protected activity, (2) that Maciel caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that Maciel's adverse action was "substantially motivated" as a response to Urioste's protected conduct. *See, e.g.*, *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *see also, e.g.*, *Williams v. Allred*, 611 F. App'x 491, 495 (10th Cir. 2015) (unpublished) (citing *Fogle v. Pearson*, 435 F.3d 1252, 1264 (10th Cir. 2006)) (discussing retaliation in prison context). The third prong requires a showing that, "but for" Maciel's improper retaliatory motive, the disciplinary action would not have taken place. *See Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quotation omitted). Urioste "must allege specific facts showing retaliation because of the exercise of [his] constitutional rights." *Id.* (quotation omitted).

In this case, Urioste's conclusory allegation of "extreme retaliation" are not the kind of specific facts required to state a valid retaliation claim, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), much less to overcome a showing of entitlement to summary judgment, *see Fitzgerald*, 403 F.3d at 1143. Further, even when such allegations are coupled with a suggestion of temporal proximity between the protected conduct and the alleged retaliation, this record is bereft of "specific facts" supporting a finding of a retaliatory motive. *See Peterson*, 149 F.3d at 1144; *see also, e.g.*, *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014) ("[T]emporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive."). And because Urioste has not identified controlling precedent that is factually on point or otherwise shown that the law clearly establishes a right to

relief on these facts, Maciel is entitled to qualified immunity in any case. *See, e.g.*, *Halley*, 902 F.3d at 1149 (quotation omitted) (discussing "obvious clarity" category of clearly established law); *Morris*, 672 F.3d at 1196 (quotation omitted) (discussing general requirement of binding precedent addressing specific factual circumstances).

In short, Urioste's § 1983 claims challenging the disciplinary revocation of his good-time credits and recreational privileges are barred because success on those claims would imply the invalidity of the underlying administrative convictions and the resulting adjustment of his duration of confinement. Even if those claims were not barred, Maciel is entitled to qualified immunity as to Urioste's due process claim insofar as it concerns the revocation of recreational privileges, as it is not clearly established that such a deprivation is actionable under the Due Process clause. Finally, because Urioste's administrative convictions were supported by evidence, and because there is nothing in the factual record to support a retaliation claim concerning those convictions and punishments in any event, Maciel is entitled to summary judgment and qualified immunity as to that retaliation claim if it is not barred by *Heck*. The undersigned therefore recommends that the Court grant summary judgment in favor of Maciel as to Urioste's § 1983 due process and retaliation claims concerning these disciplinary actions.

### 4.   PBMP Step Placement

Urioste also asserts similar due process and retaliation claims concerning his regression to lower steps in the PBMP. At issue are two instances in which Maciel allegedly caused Urioste to be "regressed" to lower steps within that program: placement in Step 2 on or about April 14, resulting from Urioste's contraband infraction in March (*see* Doc. 62 at 38); (Doc. 55-1 at 17); and placement in Step 1 on April 22, resulting from the two fishing infractions in March (*see*

Doc. 62 at 39); (Doc. 55-1 at 19).[11] As with the revocation of other privileges, Urioste complains that he was unable to present evidence on his own behalf before these placement decisions were made or seek an appeal of the underlying convictions. (*See* Doc. 62 at 38, 39). The undersigned also liberally construes the Second Amended Complaint as presenting a retaliation challenge concerning these step placements. (*See* Doc. 62 at 35).

Before addressing the merits of Urioste's PBMP-related claims, the undersigned finds at the outset that these claims are barred under the *Heck* rule. The record establishes, and Urioste seems to agree, that these step placement decisions were at least nominally premised on the same administrative convictions that led to the revocation of his good-time credits. (*See* Doc. 62 at 37-38); (Doc. 55-1 at 17, 19). Consequently, his due process and retaliation claims concerning his step placement are barred because success on those claims would necessarily imply the invalidity of his duration of confinement. *See Kilman*, 831 F. App'x at 398; *Brown*, 319 F. App'x at 705-06 (citing, *e.g.*, *Edwards*, 520 U.S at 648).

Further, for the same reasons that Maciel is entitled to summary judgment on Urioste's retaliation claim concerning the revocation of good-time credits and recreational privileges, Maciel is likewise entitled to summary judgment—and qualified immunity—on the retaliation claim concerning PBMP step placement even if that claim is not barred under *Heck*. As previously noted, the administrative convictions underlying Urioste's step placement were supported by some degree of evidence, which means that a retaliation claim premised on that

---

[11] Although Urioste also alleges that he "was regressed to step 1" again on or about June 17 (*see* Doc. 62 at 41), he does not allege that Maciel caused this regression, and there is no documentary evidence in the record that Maciel was responsible for that action. In fact, in the evidentiary submission provided by Urioste, the last step placement on record was Urioste's return to Step 2 on May 23. (*See* Doc. 55-1 at 20). However, even if the Court were to read Urioste's Second Amended Complaint as asserting a due process or retaliation challenge against Maciel for the alleged June 17 step placement, Maciel would be entitled to summary judgment in his favor because Urioste has not established the deprivation of a protected liberty interest and has not asserted more than conclusory allegations in support of his retaliation claim.

step placement cannot be maintained. *See Requena*, 893 F.3d at 1211 (quotation omitted).

Additionally, Urioste provides no evidentiary support for any such retaliation claim beyond his

conclusory allegation of "extreme retaliation," which is not enough to establish a genuine dispute

of fact as to retaliatory motive. *See Fitzgerald*, 403 F.3d at 1143; *see also Shero*, 510 F.3d at

1203 (requiring showing that adverse action was "substantially motivated" by protected

conduct); *Peterson*, 149 F.3d at 1144 (requiring showing of "but for" causation). And as noted

earlier, Urioste has identified no controlling, factually on-point precedent in his favor or

otherwise shown that the law clearly establishes a right to relief on these facts, meaning that

Maciel is entitled to qualified immunity as to this claim. *See, e.g.*, *Morris*, 672 F.3d at 1196

(quotation omitted).

Maciel is also entitled to summary judgment as to Urioste's due process claim concerning

his PBMP step placement, even if that claim is not barred under *Heck*. To clarify, Urioste does

not appear to contend that a particular step placement by itself constitutes an actionable

deprivation for due process purposes; rather, he seems to argue that these regressions implicated

a protected liberty interest because they resulted in an extension of the duration of his "solitar[y]

confinement." (*See* Doc. 38, 39).[12] But the mere fact of assignment to solitary confinement or

administrative segregation will not automatically amount to such a "significant[] and atypical[]

---

[12] The NMCD Defendants dispute that Urioste was placed in "solitary confinement" at all, asserting instead that he was "in disciplinary segregation for periods of time." (Doc. 44 at 9). This position appears to be supported both by the record (*see, e.g.*, Doc. 44-3 at 115-19) (inmate location history) and by Urioste's own allegations (*see* Doc. 62 at 40-41) (asserting that Urioste was caught passing notes to other prisoners in June, while purportedly in "solitar[y] confinement"). The NMCD Defendants' position is also supported by the PBMP's Conditions of Confinement policy, which provides that even the most restrictive step assignments primarily focus on restraints on inmate movement, limitations to in-cell hobbies and programming, and restrictions on showers, recreation, phone calls, visits, and in-cell property. (*See* Doc. 44-4 at 195-97) (describing Step 1 through Step 4 of PBMP). If the NMCD Defendants are correct, Urioste cannot show that his step regression affected a protected liberty interest. *See, e.g.*, *Barela*, 830 F. App'x at 254 (citations omitted) (recognizing that similar restraints "are common sanctions in prison, so they couldn't possibly trigger a liberty interest"). Given the procedural posture, though, the undersigned resolves this factual dispute in Urioste's favor.

[restraint] 'in relation to ordinary incidents of prison life'" as to amount to a protected liberty interest. *See Barela*, 830 F. App'x at 254 (quoting *Sandin*, 515 U.S. at 484); *see also, e.g.*, *Grissom v. Roberts*, 902 F.3d 1162, 1169-72 (10th Cir. 2018) (rejecting due process claim concerning inmate assignment to solitary confinement). Instead, courts must consider "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . ; and (4) the placement is indeterminate." *Grissom*, 902 F.3d at 1169 (quoting *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007)). Here, each of these factors weighs against a finding of a protected liberty interest.

As to the first factor, the PBMP policy documents establish that the program "is intended to reduce predatory behavior in the NMCD population" by "provid[ing] treatment to offenders who have demonstrated the inability to habilitate themselves through programs offered in general population and have engaged in predatory behavior." (*See* Doc. 44-4 at 181). Moreover, the record establishes that decisions concerning Urioste's step placement were facially related to his conviction for disciplinary infractions (*see* Doc. 55-1 at 17, 19); (Doc. 62 at 40-41), which is consistent with these aims. Urioste's conclusory allegations that the step placements were intended as retaliation for his medical requests, without more, do not controvert this record. *See Fitzgerald*, 403 F.3d at 1143 (quotation omitted). The undersigned finds no genuine dispute that Urioste's step placement furthered a legitimate penological interest.

The record also does not establish that Urioste's placement in Step 1 or Step 2 of the PBMP resulted in "extreme" conditions. Even assuming that Urioste's step placements resulted in an extended period of solitary confinement, he does not attest to any additional corresponding conditions resulting specifically from those step placements. By contrast, the PBMP policy

documents describe conditions—primarily consisting of closer monitoring and restrictions on

certain privileges—that are not extreme when compared to the usual circumstances of

incarceration. (*See* Doc. 44-4 at 195-96) (describing restrictions applicable to these steps); *see*

*also, e.g.*, *Marshall*, 421 F. App'x at 838 (finding that privilege restrictions associated with

inmate classification level did not constitute extreme deprivation).

      The record also belies any argument that step regression within the PBMP resulted in an

increase in the duration of Urioste's confinement. Urioste alleges nothing of the sort, and the

PBMP policy documents give no indication that step assignment affects the length of an inmate's

incarceration. If anything, the PBMP policies make clear that an approaching release date will

affect an inmate's step placement, not the other way around. (*See* Doc. 44-4 at 198) (noting

automatic placement in the final PBMP step if inmate is within 180 days of release from prison).

      Finally, Urioste himself has confirmed that his step placements, and the allegedly

associated period of solitary confinement, were not for an indeterminate period. Even if the

record suggested that Urioste remained in either Step 1 or Step 2 for extended periods of time,

the undersigned notes that PBMP policy requires that the UMT provide for a review procedure

no later than eighteen months after an inmate first enters the program, with further reviews on an

annual basis thereafter, to consider the justification for an inmate's continued placement in the

program. (*See* Doc. 44-4 at 206). "The availability of periodic reviews . . . suggests that the

confinement was not indefinite." *Rezaq v. Nalley*, 677 F.3d 1001, 1016 (10th Cir. 2012) (citing

*Wilkinson*, 545 U.S. at 224) (noting that "duration is properly considered in tandem with

indeterminacy"). Here, however, Urioste directly acknowledges that only a *fixed* period of

additional time in solitary confinement resulted from each relevant step placement. (*See* Doc. 62

at 38, 39, 41) (contending that regressions on April 14 and April 22 respectively added four

months and nine months to time in solitary confinement).[13] This factor, therefore, weighs against a finding of a liberty interest.

In light of this analysis, there is no genuine dispute of material fact as to each of the four factors addressed in *Grissom* and *DiMarco*, and each one of these factors weighs against a finding that Urioste's PBMP step placement amounted to a protected liberty interest even if each placement decision resulted in an additional period of solitary confinement. Moreover, Urioste has not pointed to any controlling precedent or general statements of law sufficient to show that it was clearly established that his step placement would amount to a due process violation. On the contrary, the conditions described in the record and in Urioste's complaint do not appear to be materially different from those that the Tenth Circuit has found would *not* implicate a protected liberty interest. *See, e.g.*, *Rezaq*, 677 F.3d at 1013-15 (finding no protected liberty interest where administrative segregation furthered similar interests, provided for similar levels of restrictions, did not increase duration of confinement, and provided for periodic review process); *DiMarco*, 473 F.3d at 1342-44 (holding administrative segregation did not trigger liberty interest where purpose was valid, conditions of confinement were "admittedly spartan[] but not atypical of protective custody," duration of confinement was not extended, and placement was reviewed every ninety days); *see also, e.g.*, *Marshall*, 421 F. App'x at 838-39 (affirming dismissal of due process claim concerning inmate classification level). Therefore, Maciel is entitled to qualified immunity to the extent that Urioste's claim concerns his PBMP step placement.

---

[13] The NMCD Defendants have argued that Urioste was released entirely from the PBMP on August 22, when he was transferred to PNM's South Facility. (*See* Doc. 44 at 14); (*see also* Doc. 44-2 at 115) (location history). The undersigned does not credit this unsworn argument at this stage, as there is no record evidence directly suggesting a relationship between Urioste's housing location and his step placement in the PBMP.

In summary, the principles set forth in *Heck* and its progeny bar Urioste's § 1983 due process and retaliation claims against Maciel concerning PBMP step placement. Even if such claims were not so barred, Maciel is entitled to qualified immunity and summary judgment as to Urioste's retaliation claim regarding his step placement. Further, Urioste has not shown that his step placement amounted to a deprivation of a protected liberty interests, and to the extent that his due process challenge attacks those placement decisions, Maciel is entitled to qualified immunity. The undersigned therefore recommends that the Court grant summary judgment in favor of Maciel as to these due process and retaliation claims.

### 5.   *Legal Phone Call*

Elsewhere, Urioste attests that Maciel "cancelled" a phone call scheduled between himself and his attorney on April 11 (*see* Doc. 62 at 37), an allegation that Maciel denies (*see* Doc. 104-1 at 2). It is not clear that Urioste even argues that this alleged incident constituted retaliation for the exercise of constitutionally protected conduct. But assuming that he is so arguing, and assuming the truth of this allegation, Maciel is nonetheless entitled to summary judgment. Urioste has alleged no further facts concerning this incident, let alone sufficient facts to establish a prima facie case that this injury would chill an ordinary person from continuing to engage in protected conduct or that such conduct was the "but for" motivation behind Maciel's actions. *See Shero*, 510 F.3d at 1203; *Peterson*, 149 F.3d at 1144. Nor does the record outside of Maciel's Second Amended Complaint contain any evidence concerning this incident, much less evidence supporting a finding of retaliatory motivation. On this record, the undersigned recommends that the Court grant summary judgment in favor of Maciel as to Urioste's ostensible retaliation claim pertaining to the cancelled legal phone call on April 11.

### 6.   Unsanitary Cells

Urioste also alleges that he was unconstitutionally housed in unsanitary conditions during the relevant period. Urioste contends that Maciel violated his Eighth Amendment protections, and also impermissibly retaliated against him "for seeking medical aid," by "mov[ing]" him to cell 3BW111 on June 27. (*See* Doc. 62 at 41); (*see also* Doc. 44-2 at 115) (location history). Similarly, Urioste asserts that Cordova breached his Eighth Amendment protections when "plac[ing]" him in cell 3BW109 after his return from St. Vincent's Hospital on July 18. (*See* Doc. 62 at 27-28); (Doc. 44-2 at 115).[14] Urioste alleges various degrees of "filth[]" existed in both cells, at least upon his arrival. (*See* Doc. 62 at 27-28, 41).

Urioste's retaliation claim against Maciel may be resolved quickly enough. His conclusory allegation that Maciel acted with retaliatory intent by moving him to cell 3BW111 cannot serve as evidence that Maciel's housing decision was "substantially motivated" by Urioste's medical requests. *See Shero*, 149 F.3d at 1203 (outlining requirements for retaliation claim); *see also Fitzgerald*, 403 F.3d at 1143 (addressing value of conclusory allegations at summary judgment). This dooms Urioste's claim because he can point to no evidence of record to support a finding of retaliatory intent in this housing decision.[15] Without more, there is no evidentiary basis in the record to support a retaliation claim against Maciel premised on the move to cell 3BW111.

---

[14] Urioste does not explicitly allege that his cell assignment on July 18 amounted to retaliation for his medical requests. Indeed, since Urioste had just returned from St. Vincent's Hospital at that time, it does not appear that Urioste was seeking any additional medical attention or was otherwise engaged in protected conduct prior to this housing decision. (*Cf.* Doc. 62 at 27.) Thus, without further evidence, any potential retaliation claim relating pertaining this incident would fail.

[15] If anything, Urioste's own allegations suggest a different motivation underlying his move to a different pod: his regression back to Step 1 of the PBMP ten days earlier, following yet another disciplinary infraction. (*See* Doc. 62 at 40-41). Nevertheless, the factual record does not definitively establish any particular reason—retaliatory or otherwise—for Urioste's move to a new cell.

Because Urioste attests to the "filthy" nature of these two cells in some detail, his deliberate indifference claims require additional analysis. "Under the Eighth Amendment, jail officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (cleaned up). Similar to other deliberate indifference claims, a plaintiff asserting a claim that unsanitary living conditions violated his Eighth Amendment rights must satisfy both (1) an objective component showing that the alleged deprivation was sufficiently serious, and (2) a subjective component showing both awareness of facts from which an inference of a substantial risk of serious harm could be drawn and that such an inference was in fact drawn. *See id.* (quotation omitted); *see also, e.g.*, *Walker*, 947 F.3d at 1250 (citation omitted).

In determining whether an objectively serious deprivation has occurred, the Tenth Circuit has counseled that while a filthy cell "may be tolerable for a few days, . . . the length of time a prisoner must endure an unsanitary cell is simply one factor in the constitutional calculus," *McBride*, 240 F.3d at 1291 (cleaned up), even if that factor is "often of prime importance," *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). Because "the degree of filth endured" is "equally important," the "length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." *McBride*, 240 F.3d at 1291 (quotations omitted). Accordingly, the Tenth Circuit has held that a three-day period in a cell with "human feces and urine on the walls and floor, pieces of a mattress on the floor caked with feces and urine, and a dozen plastic food trays with decayed food," with access to cleaning supplies refused, will state an Eighth Amendment violation. *See id.* at 1292. Likewise, the Tenth Circuit has found a sufficiently serious deprivation where a cell block was flooded for thirty-six hours,

the toilet system was turned off for almost the entire time, and a prisoner was exposed to his and other inmates' bodily waste in standing water for that full period. *See DeSpain*, 264 F.3d at 972-75.

On the other hand, where the allegations or facts do not establish "physical exposure to human waste over a multi-day period," the Tenth Circuit has been hesitant to find a constitutional violation. *See, e.g.*, *Barnes v. Wiley*, 203 F. App'x 939, 940-41 (10th Cir. 2006) (unpublished) (affirming dismissal of Eighth Amendment claim concerning hourly two-flush limit, despite inmate's medical condition requiring urination "at least six times an hour"); *see also Lewis v. McKinley Cnty. Bd. of Cnty. Comm'rs*, 425 F. App'x 723, 727-28 (10th Cir. 2011) (unpublished) (citations omitted) (collecting cases where conditions of confinement stated or failed to state claim, and affirming dismissal of claim concerning "filthy" cell that featured clogged drain and "had to be sprayed regularly for bacteria"). And of course, even where an objectively sufficiently serious deprivation could be established, courts will dismiss an Eighth Amendment claim where the complaint "lacks sufficient allegations to meet the [subjective] element of deliberate indifference." *See Lewis*, 425 F. App'x at 728.

Urioste alleges that Maciel moved him to "a disciplinary pod" on June 27 and that he was "forced to live in a cell with no plumbing and feces in the toilet for several days." (Doc. 62 at 41). The undersigned questions whether these brief allegations, particularly the conclusory and vague assertion regarding the period of proximity to human waste in a toilet, would suffice to establish a sufficiently serious violation for purposes of qualified immunity without additional specificity. That question need not be resolved, though, since Urioste cannot establish on this record that Maciel was aware of the plumbing situation in his cell or that Maciel drew an inference that the circumstances presented a substantial risk to his health. For instance, Urioste

does not allege that Maciel personally observed the absence of working plumbing or the presence of feces in his toilet, and he does not allege that he informed Maciel or any other officer of these circumstances at any point. Because the record presents no evidence to support the subjective component of an Eighth Amendment claim against Maciel regarding unsanitary living conditions, Maciel is entitled to qualified immunity on this claim.

Urioste further claims that Cordova "placed" him in cell 3BW109 at 4 P.M. on July 18, that there were "feces and blood on the walls" of the cell and feces "all over the toilet," and that unnamed officers told him "[a]fter midnight" that he would "have to ask the day shift" for cleaning supplies. (*See* Doc. 62 at 27-28). Urioste does not address the length of time that his cell remained in a purportedly unsanitary condition, except to suggest that this period of time was longer than eight hours. (*See id.* at 28). Nor does Urioste discuss other facts "concerning the severity of the complained-of conditions (e.g., the amount of human waste . . . ) or the extent of his exposure (e.g. whether his person or property had any contact with the human waste . . . )." *See Washington v. Martinez*, No. 19-cv-00221-MEH, 2020 WL 209863, at *5-6 (D. Colo. Jan. 14, 2020) (dismissing Eighth Amendment claim where inmate alleged "hours" of exposure to feces and blood on cell floors and walls, without further specificity). Without more, Urioste's conclusory allegations regarding the "filthy" nature of his cell are not enough to establish an objectively sufficiently serious condition for Eighth Amendment purposes.

The undersigned also concludes that Urioste has not satisfied the subjective component of a claim against Cordova on this basis. As was true with Maciel and cell 3BW111, Urioste has not asserted that Cordova was aware of the conditions in cell 3BW109 or otherwise shown that Cordova possessed facts allowing an inference that a substantial risk of harm existed. Although Urioste contends that his requests for "cleaning supplies were ignored" (Doc. 62 at 28), he does

not allege that these requests were made to Cordova or even that Cordova had any further involvement with him after placing him in this cell. Absent further relevant evidence, Cordova is entitled to judgment as a matter of law as to this claim.

In any event, this record also establishes that Cordova is entitled to qualified immunity. Urioste has not shown that his claim is factually aligned with the circumstances addressed in *DeSpain*, *McBride*, or other Tenth Circuit decisions finding a viable Eighth Amendment claim due to unsanitary living conditions, such as overwhelming or direct contact with bodily waste and associated odors for thirty-six hours or longer. *Cf., e.g.*, *DeSpain*, 264 F.3d at 972-75 (reversing dismissal of Eighth Amendment claim concerning inmate's thirty-six-hour exposure to his and other inmates' bodily waste due to cell flooding and nonfunctioning toilets). Nor has he otherwise shown that the law clearly establishes an entitlement to relief on this claim.

For the foregoing reasons, the undersigned recommends that the Court grant summary judgment in favor of Maciel and Cordova as to Urioste's Eighth Amendment claims regarding unsanitary living conditions.

### 7.   *Extended Periods in Showers*

Urioste alleges that on two occasions in early July, Cordova forced him to stand in the shower area for ninety minutes even though the water was shut off after five minutes. (*See* Doc. 62 at 42). He further alleges that these incidents occurred while or after he asked for medical personnel. (*See id.* at 42-43). Urioste does not state whether medical personnel saw him after the July 4 incident, and though he alleges that "[m]edical was never called" after the July 11 incident (*see id.*), he acknowledges that he was seen by medical personnel the following day, just before his gallbladder removal surgery (*see id.* at 25-26). Urioste appears to allege that these incidents

amounted to deliberate indifference and retaliation for his requests for medical attention. (*See id.* at 41-43).

To the extent that Urioste's deliberate indifference claim concerns requests for medical attention made to Cordova being allegedly ignored on both occasions, he has failed to establish a genuine dispute of material fact as to that claim. Urioste does not attest to any relevant details concerning why he was requesting medical attention on either occasion. Without such facts, Urioste has not shown that he faced a "sufficiently serious" deprivation as a result of any delay. *See, e.g.*, *Sealock*, 218 F.3d at 1210 (describing objective component of Eighth Amendment claim). Likewise, without more, his mere allegation that he requested medical attention does not establish that Cordova was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," nor that Cordova "also dr[e]w the inference." *Walker*, 947 F.3d at 1250 (quotation omitted). As Urioste has failed to establish either the objective component or the subjective component of an Eighth Amendment claim concerning these incidents, Cordova is entitled to summary judgment on any corresponding claim.

If Urioste is claiming an Eighth Amendment deprivation resulting from being left in the shower area for an extended period of time, such a claim would be equally lacking in foundation. Urioste has not shown that being left in a shower area for ninety minutes at a time amounts to a sufficiently serious deprivation, that Cordova was aware of facts supporting an inference that a substantial risk of serious harm arose from those circumstances, or that Cordova drew that inference. Any Eighth Amendment claim premised on being left in the shower area for extended periods fails on its face.

Urioste also has not shown that Cordova actionably retaliated against him for making medical requests by leaving him in the shower area. The only facts in the record relevant to a

causation analysis are that there was some temporal proximity between Urioste's requests and the time spent in the shower area and that Cordova made some caustic remarks in response to those requests. (*See* Doc. 62 at 42-43). On this record, the undersigned doubts that Urioste can establish a genuine dispute of fact as to whether Cordova's conduct may have been "substantially motivated" by Urioste's protected activity. *See Shero*, 510 F.3d at 1203 (citation omitted). But even if such a showing could be made, nothing in this record—including Urioste's sworn allegations—establishes that being left in a shower area for extended periods could have amounted to "an injury that would chill a person of ordinary firmness from continuing to" request medical assistance. *See id.* (citation omitted). Binding precedent is clear that "a trivial or de minimis injury" cannot support a retaliation claim, *see id.* (quoting *Eaton v. Meneley*, 379 F.3d 949, 954-55 (10th Cir. 2004)), and nothing in the record suggests that Urioste's extended time in the shower area was anything more than a trivial inconvenience. Consequently, Urioste cannot succeed on a retaliation claim premised on such conduct.

The undersigned concludes that Cordova is entitled to judgment as a matter of law as to Urioste's Eighth Amendment and retaliation claims concerning his extended periods in the unit shower area, as no constitutional violation is established on the factual record presented. Moreover, Cordova is entitled to qualified immunity because Urioste has not pointed to any binding Tenth Circuit or Supreme Court precedent that is factually on point so as to clearly establish that the conduct at issue amounted to a constitutional violation, and he has not shown that any relevant general statements of law apply with obvious clarity to his particular factual circumstances. The undersigned therefore recommends that the Court grant summary judgment in favor of Cordova as to these claims.

8.    *Official Capacity Claims*

In his Second Amended Complaint, Urioste asserts all claims against the NMCD

Defendants in their official capacities as well as in their individual capacities. (*See* Doc. 62 at 3).

"An official capacity suit is only another way of pleading an action against an entity of which an

officer is an agent." *See Johnson v. Bd. of Cnty. Comm'rs*, 85 F.3d 489, 493 (10th Cir. 1996).

However, no official-capacity claim may lie where there is no underlying constitutional

violation. *See, e.g.*, *Martinez*, 563 F.3d at 1091-92 (citation omitted). Accordingly, to the extent

that the undersigned recommends that the Court grant summary judgment in favor of the NMCD

Defendants in their individual capacity, so too does the undersigned recommend that the Court

grant summary judgment to these Defendants in their official capacities.

Insofar as Urioste seeks monetary damages from the NMCD Defendants in their official

capacities, his claims fail for a second reason. The Supreme Court has recognized that "State

agencies (including correctional facilities) are not persons" for purposes of a § 1983 claim for

monetary damages. *Krebs v. El Dorado Corr. Facility*, 673 F. App'x 891, 892 (10th Cir. 2016)

(unpublished) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)). The NMCD

Defendants are state correctional officers, and as such Urioste's official-capacity claims are "no

different from a suit against the State itself." *Will*, 491 U.S. at 71 (citations omitted). Urioste's

remaining claims for damages against these Defendants in their official capacities[16] are,

therefore, not viable. *See, e.g.*, *Krebs*, 673 F. App'x at 893-94; (*see also* Doc. 26 at 5) (citing

*Will*, 491 U.S. at 71) (ruling similarly as to ostensible official-capacity claims against former

Defendant).

---

[16] The undersigned notes that the Court has already dismissed the majority of Urioste's official-capacity claims. (*See* Doc. 84 at 2).

## IV.   REVIEW OF PROCEDURAL POSTURE AND STATUS OF CLAIMS AND PARTIES

Given the extended and at times convoluted procedural posture of this case, the undersigned provides below a brief description of the status of all claims and parties identified in this action, along with the undersigned's understanding of where those claims and parties stand if the recommendations proposed herein are adopted.

In his first Amended Complaint, Urioste purported to assert claims against Defendant Gregg Marcantell as well as against Defendants Corizon and Centurion Health Partners. (*See* Doc. 24). The Court has dismissed all claims against these Defendants with prejudice and has dismissed those Defendants as parties to this proceeding. (*See* Doc. 26 at 8-9). The Court has also dismissed all claims for injunctive relief. (*See id.* at 9).

Along with Defendant Oscar Treviso, several NMCD Defendants—specifically Franco, Olivas, Boyer, Trujillo, Perez, and Palomino—filed a *Martinez* Report addressing Urioste's claims against them in their individual and official capacities. (*See* Doc. 44). Defendant Treviso has been dismissed, and with the exception of certain retaliation claims against Defendant Palomino, the rest of those Defendants have been awarded summary judgment as to all of Urioste's claims against them in either capacity. (*See* Doc. 84); (*see also* Doc. 73) (May 6, 2021 PFRD addressing said claims and Defendants). The aforementioned retaliation claims against Defendant Palomino in his individual capacity remain pending. (*See id.*).

The instant Second *Martinez* Report concerns Urioste's claims against Maciel and Cordova, as well as any remaining official-capacity claims. (*See* Doc. 104). If the Court elects to adopt today's proposed findings and recommendations, Maciel and Cordova would be awarded summary judgment as to all of Urioste's claims against them, and the NMCD Defendants would be awarded summary judgment as to any remaining official-capacity claims.

Finally, adoption of the findings and recommendations proposed by the undersigned would require dismissal without prejudice of all claims against Defendants Jose Martinez, M.D., and Ben Martinez, P.A. As stated herein, such dismissal is required due to Urioste's failure to timely effect service on those Defendants, his failure to show cause for the lack of service, and the absence of any factors supporting further extension of the service deadline.

## V.  CONCLUSION

**IT IS, THEREFORE, RECOMMENDED** that the Court:

1)      GRANT summary judgment to Defendant Maciel as to Urioste's claims against him in his individual capacity;

2)      GRANT summary judgment to Defendant Cordova as to Urioste's claims against him in his individual capacity;

3)      GRANT summary judgment to the NMCD Defendants as to all remaining official-capacity claims against them in this action; and

4)      DISMISS WITHOUT PREJUDICE all claims against Defendants Jose Martinez, M.D., and Ben Martinez, P.A.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN (14) DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension of time must be filed in writing no later than seven (7) days from the date of this filing. A party must file any objections with the Clerk of the District Court within the fourteen (14) day period, together with any period for which an order is entered granting an extension of time, if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**